Argued and submitted September 26, 1980, affirmed February 3, 1981

## FLURY et al
*Petitioners,*

*v.*

## LAND USE BOARD OF APPEALS et al
*Respondents.*

(LUBA No. 79-006, CA 17374)

623 P2d 671

Donald A. Dole, Roseburg, argued the cause for petitioners. With him on the brief was Neuner, Dole, Caley & Kolberg, Roseburg.

Mark J. Greenfield, Portland, argued the cause and filed the brief for respondents 1000 Friends of Oregon and Neil C. Talcott.

Al J. Laue, Assistant Attorney General, Salem, waived appearance for respondent Land Use Board of Appeals.

Clifford W. Kennerly, County Counsel, Roseburg, waived appearance for respondent Douglas County, Oregon.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARDEN, J.

## WARDEN, J.

Petitioners own 860 acres of land in the North Umpqua portion of Douglas County, 480 acres of which they seek to subdivide into twelve forty-acre parcels. The Douglas County Planning Commission and the Board of County Commissioners (county) approved the proposed plat, known as the "Colliding River Ranches Subdivision." The county characterized the land as marginal agricultural land for livestock grazing and found the preferred use of the parcels to be for small woodlots. Respondents Talcott and 1000 Friends of Oregon (1000 Friends) petitioned for review before the Land Use Board of Appeals (LUBA), which reversed the decision of the county. Petitioners seek judicial review of the LUBA decision.

In the petition for judicial review of LUBA's final order, petitioners assign as error: (1) the finding that 1000 Friends had standing to participate as a party in the proceedings before LUBA; (2) the finding that the proposed plat violated Statewide Planning Goal 3, Agricultural Land; and (3) the finding that plat approval would not permit agricultural practices on adjacent lands. We affirm.

■     Petitioners argue that 1000 Friends lacked standing before LUBA, because 1000 Friends was not entitled to notice and hearing under the county's zoning ordinance. Or Laws 1979, ch 772, § 4 (3) provides the applicable test for standing:

"(3)   Any person who has filed a notice of intent to appeal as provided in subsection (4) of this section may petition the board for review of a quasi-judicial land use decision if the person:

(a)   Appeared before the city, county or special district governing body or state agency orally or in writing; *and*

(b)   Was a person entitled as of right to notice and hearing prior to the decision to be reviewed *or was a person whose interests are adversely affected or who was aggrieved by the decision."* (Emphasis supplied.)

Petitioners find support for their contention that 1000 Friends did not properly appear below in the wording of the orders of the Planning Commission and Board of County Commissioners, which refer to counsel for 1000 Friends as representing respondent Talcott. The record, however, shows that 1000 Friends did appear both orally and in

writing in its own right before the county. The attorney representing respondent Talcott also appeared "on behalf of 1000 Friends of Oregon." The requirement in subsection (a) of the statute is satisfied.

The standing of respondent Talcott is not challenged. Talcott became a member of 1000 Friends prior to the final decision of the county commissioners. In *1000 Friends of Oregon v. Multnomah County,* 39 Or App 917, 929, 593 P2d 1171 (1979), 1000 Friends of Oregon was accorded representational standing under former ORS 197.300(1)(d) (1977), which authorized any person "whose interests are substantially affected" to challenge a land use decision by petitioning LCDC. The current statute, *supra,* requires the person to be "adversely affected or aggrieved." We see no material difference in the wording of the two provisions for purposes of representational standing. The alternative requirement in subsection (b) is also satisfied. We conclude that 1000 Friends had standing to participate as a party in the proceedings before LUBA.

With respect to the second assignment of error, petitioners first assert that in determining whether land is agricultural for purposes of Goal 3[1] by examination of the soil capability classes, only the affected land, that is, the land to be divided into smaller parcels, need be considered. LUBA held to the contrary in its final order:

---

[1] OAR 660-15-000(3)(Appendix A) provides in relevant part:

"Agriculture lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise with [sic] the area. * * *

" * * * * *

"AGRICULTURAL LAND—in western Oregon is land of predominantly Class I, II, III and IV soils and in eastern Oregon is land of predominantly Class I, II, III, IV, V and VI soils as identified in the Soil Capability Classification System of the United States Soil Conservation Service, and other lands which are suitable for farm use taking into consideration soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land use patterns, technological and energy inputs required, or accepted farming practices. Lands in other classes which are necessary to permit farm practices to be undertaken on adjacent or nearby lands, shall be included as agricultural land in any event."

"[Petitioners] in effect are arguing that in determining soil class for purposes of deciding whether Goal 3 or Goal 4 is to be applied in this case the only soil that must be considered is that making up the 480 acres which they desire to further subdivide into 12 parcels. Since the land has most recently been used as a commercial agricultural enterprise it must, however, be viewed as an entity and any decision must take into consideration the soil on the entire 860 acres rather than just the 480 acres as [petitioner] argues. When the land in question is part of a larger parcel, the farm as a whole must be examined to determine if it is predominantly Class I-IV soils. *Meyer v. Lord,* 37 Or App 59, 586 P2d 367 (1978)."

While *Meyer v. Lord,* 37 Or App at 69, does state that in determining the suitability of land for farm use the land affected by the proposed change "should not be considered as if it were an isolated tract," the suitability of land for farm use is a different matter from the preliminary and more mechanical question whether the land consists predominantly of soils in capability classes I-IV. Only the land to be subdivided need be examined to determine whether it falls predominantly within classes I-IV and would thus be presumed agricultural.

LUBA's error does not affect the result in this case, however. The county commissioners found that the soils on the proposed subdivision were predominantly of capability classes IV and VI. While that finding has support in the evidence, it does not address the relevant issue. The proper threshold inquiry is whether the affected land is predominantly of soil capability classes I-IV. *Miles v. Bd. of Comm. of Clackamas County,* 48 Or App 951, 955, 618 P2d 986 (1980). Petitioners' own expert determined that 290 of the 480 acres in the subdivision fall within classes I-IV, and the record does not show otherwise. The presumption is that the land is agricultural, and Goal 3 is applicable, as LUBA determined.

Petitioners' central contention is that where land meets both the Goal 3 definition of agricultural land[2] and the Goal 4 definition of forest land,[3] "compliance [with the

---

[2] See n. 1.

[3] OAR 660-15-000(4) (Appendix A) provides in relevant part:

statewide planning goals] is achieved if local government can adequately demonstrate that its land use considers and accommodates as much as possible applicable planning goals," with citation to *1000 Friends v. Benton County,* 32 Or App 413, 575 P2d 651, *rev den by opinion* 284 Or 41, 584 P2d 1371 (1978). In other words, petitioners contend that the county here properly chose forestry use instead of agricultural use for the subdivision, and that if Goal 4 is satisfied (which we assume here *arguendo),* Goal 3 need not be. The county's order stated in relevant part:

> "Viewing the twelve parcels in their entirety will identify them as 'overlapping lands' which meet both the agricultural and forest land definitions. Based upon all of the testimony but more particularly the testimony of Rufus Cate, we find the property has low soil fertility, is more suitable for timber growing than grazing, climatic conditions are favorable to timber, there is a lack of any irrigation potential, the existing land use patterns in the area are timber, the adjacent lands are commercial forest lands, there is a definite need for commercial forest lands in Douglas County, and there is a need for watershed protection and protection of vegetive [sic] cover, and urban buffers. *Therefore, the Commission finds that the use of the twelve parcels as forest lands is preferred over the use of said lands as agricultural lands. The proposed twelve lots are at best marginal agricultural land for livestock grazing. The factors, however, more strongly support their use as forest land."* (Emphasis supplied.)

---

"Forest land shall be retained for the production of wood fiber and other forest uses. Lands suitable for forest uses shall be inventoried and designated as forest lands. Existing forest land uses shall be protected unless proposed changes are in conformance with the comprehensive plan.

" \* \* \* \* \*

"FOREST LANDS—are (1) lands composed of existing and potential forest lands which are suitable for commercial forest uses; (2) other forested lands needed for watershed protection, wildlife and fisheries habitat and recreation; (3) lands where extreme conditions of climate, soil and topography require the maintenance of vegetative cover irrespective of use; (4) other forested lands in urban and agricultural areas which provide urban buffers, wind breaks, wildlife, and fisheries habitat, livestock habitat, scenic corridors and recreational use.

" \* \* \* \* \*."

*1000 Friends v. Benton County, supra,* contains the following dicta, 32 Or App at 426-27:

"However, contrary to petitioners' position, Goal 3 does not mandate that all agricultural lands be preserved and maintained for farm use and eventually placed in exclusive farm use zones. The goal requires that such action be taken 'consistent with existing needs for agricultural production, forestry and open space.' This is in harmony with the principle we established in *Sunnyside Neighborhood [v. Clackamas Co. Comm.,* 27 Or App 647, 557 P2d 1375 (1976), *reversed on other grounds,* 280 Or 3, 569 P2d 1063 (1977)]* that local governments are required to address and accommodate 'as much as possible all applicable planning goals.' 27 Or App at 654. The quoted language from Goal 3 is an express directive by LCDC [Land Conservation and Development Commission] that Goal 3 must be considered in conjunction with other LCDC goals, specifically Goal 4, Forest Land, and Goal 5, Open Space. It is also clear that considering Goals 3, 4 and 5 alone may not be sufficient when those goals are read in context with all LCDC goals. For example, Goal 14, Urbanization, has specific provisions applicable to lands which meet the agricultural lands definition of Goal 3."

The majority language quoted above was not actually utilized in the decision. Furthermore, the principle alluded to in *Sunnyside Neighborhood v. Clackamas Co. Comm., supra,* emanated in the context of an amendment to a comprehensive plan. The action here involved approval of a subdivision prior to acknowledgment by the Land Conservation and Development Commission (LCDC) that a county's comprehensive plan is in compliance with the planning goals. ORS 197.251(1). We do not take *1000 Friends v. Benton County* to be compelling authority for the proposition that compliance with one statewide planning goal may excuse compliance with another, prior to acknowledgment of the comprehensive plan.

Petitioners place more reliance on a policy paper by LCDC entitled "Agriculture/Forestry Goals Interrelationship," which states in relevant part:

"In many instances, overlapping lands (Class I-IV (I-VI) soils) will be designated for forest uses. *There is no conflict with Goal 3 if adequate protection is provided those lands. The intent of any protective mechanism should be to provide*

*an area where forest and agricultural practices can occur
without interference in order to conserve resource lands for
the future.* Protection of overlapping lands with Class I-IV
(I-VI) soils can be accomplished using the following proce-
dures:

"1. *Proper Zoning.* Forest uses described in Goal 4 should
be permitted outright. Overlapping lands without a clear
distinction or suitability for either agricultural or forest
uses should allow for the uses identified in Goals 3 and 4."
(Emphasis supplied.)

In its final order, approved by LCDC, LUBA
characterized the above statement of policy as being "in-
tended to be used in the formulation of comprehensive
plans rather than to be applied on a case by case basis." In
support of that characterization, 1000 Friends argues that
only in the comprehensive planning process can a county
identify factors for designating resource lands as agricul-
tural, forest, or farm/forest, and apply those factors *consist-
ently* and *uniformly* to all overlapping lands within the
jurisdiction. Be that as it may, LUBA appears to have
based its decision on its interpretation of the LCDC policy
for overlapping lands as applied to this land use decision.

LUBA construed the above statement of policy to
indicate "an intention by LCDC to leave lands which fall
into the overlapping category in a condition where one use
of the lands does not preclude an alternative use of the
lands." LUBA reasoned that that intent was not met here
by the county's approval:

"There was no showing by the [petitioners] nor was
there a finding by [the county] that the proposed 40-acre
lots would allow for the continuation of agricultural activi-
ty on the lands. The interrelationship paper stresses flexi-
bility in order to conserve the resource lands for the future,
flexibility which would be destroyed if the only future use
that could be made of this property was that of small
woodlands. *As an overlapping land, both agricultural and
forest uses must be protected. The evidence shows that a
minimum of 200-250 acres of land is necessary for a viable
agricultural unit to exist in the North Umpqua area. The
[petitioners'] proposal precludes the use of the property as
anything but 40-acre woodlands."* (Emphasis supplied.)

That policy appears to be that *both* agricultural
and forest uses must be adequately protected on so-called

"overlapping lands," at least prior to acknowledgment of the comprehensive plan by LCDC. We give deference to its formulation of policy. *Norvell v. Portland Area LGBC,* 43 Or App 849, 852, 604 P2d 896 (1979). LUBA concluded here, with LCDC's concurrence, that agricultural uses were not and could not be adequately protected by the proposed subdivision, given the undisputed evidence that a commercial grazing operation would require a minimum acreage several times larger than the size of the proposed individual parcels.

■ Goal 3 requires a finding that the lot sizes created by a division of agricultural land be sufficient for the continuation of the existing commercial agricultural enterprise. *Meeker v. Board of Commissioners,* 287 Or 665, 674, 601 P2d 804 (1979); *Jurgenson v. Union County Court,* 42 Or App 505, 513, 600 P2d 1241 (1979). In its order, the county adopted findings of its planning commission which conceded that the subject property here was part of an existing cattle and sheep ranch.[4]

■ We conclude that LUBA's determination that the requirements of Goal 3 were not met by the county's approval of the Colliding River Ranches Subdivision is not unlawful in substance or procedure and is supported by substantial evidence in the record. Or Laws 1979, ch 772, § 6a (8).

Due to our disposition of the second assignment of error, it is unnecessary to reach petitioners' third assignment. Petitioners have not assigned as error LUBA's failure to address the question whether the proposed subdivision complies with Goal 4, but in any event, we need not reach the Goal 4 issue to decide this case.

Affirmed.

---

[4] The county also found that the ranch was not a "viable self-supporting economic unit." That finding would not be sufficient to support zoning for nonfarm uses. *See* ORS 215.203(2)(a). The land is clearly capable of "current employment for agricultural production for the purpose of earning [gross] money receipts." *1000 Friends v. Benton County, supra,* 32 Or App at 429. Moreover, there was apparently no evidence as to the future profitability of the land in the hands of a reasonably motivated and skilled farmer. *See 1000 Friends v. Benton County, supra* 32 Or App at 431 n 2, 432 (Schwab, C.J., concurring). It is interesting to note that the land proposed for small woodlots is not currently stocked with timber.