Argued and submitted January 23, reversed and remanded for reconsideration March 21, (67 Or App 418,679 P2d 320), reconsideration allowed, former opinion withdrawn, affirmed as modified June 27 (68 Or App 765, 686 P2d 375), reconsideration denied September 7, petition for review allowed October 9, 1984 (298 Or 68)
See 299 Or 344 (1985)

## 1000 FRIENDS OF OREGON et al,
*Respondents - Cross-Petitioners,*

*v.*

## WASCO COUNTY COURT,
*Respondent - Cross-Respondent,*

*and*

## KNAPP et al,
*Petitioners - Cross-Respondents.*

(81-132; CA A29802)

679 P2d 320

Allen L. Johnson, Eugene, argued the cause for petitioners - cross-respondents. With him on the briefs were Corinne C. Sherton, and O'Donnell, Sullivan & Ramis, Salem.

Robert E. Stacey, Jr., Portland, argued the cause for respondents - cross-petitioners. With him on the brief was Mark J. Greenfield, Portland.

Wilford K. Carey, Hood River, argued the cause and filed the brief for respondent - cross-respondent.

Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, March J. Deits, Assistant Attorney General, and Michael B. Huston, Assistant Attorney General, Salem, filed the brief for the Land Conservation and Development Commission.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Newman, Judge.

RICHARDSON, P. J.

Joseph, C. J., concurring.

## RICHARDSON, P. J.

Petitioners appeal and respondents[1] cross-appeal from an order of the Land Use Board of Appeals (LUBA) holding that the Wasco County Court erred in approving the petition and authorizing an election for the incorporation of the city of Rajneeshpuram. LUBA remanded the matter to the county for further proceedings. We reverse and remand LUBA's order.

In July, 1981, petitioner Chidvalis Rajneesh Meditation Center purchased a 64,000 acre ranch located in Wasco and Jefferson counties. In October, 1981, a petition to incorporate a 2,135 acre area within the Wasco County portion of the ranch was filed with the county by 42 registered voters residing in the area. *See* ORS 221.010 *et seq.* The county court held a hearing on November 4, 1981, approved the petition and authorized a special incorporation election. Respondents appealed the county's decision to LUBA. LUBA dismissed that appeal on the ground that the county action was not a "land use decision" subject to LUBA's jurisdiction. Former ORS 197.015(10).[2] The dismissal was appealed to this court, and we concluded that "the County's decision to authorize an incorporation election is a land use decision subject to LUBA review." *1000 Friends of Ore. v. Wasco Co. Court,* 62 Or App 75, 82, 659 P2d 1001, *rev den* 295 Or 259 (1983). We therefore remanded the matter to LUBA, and the present appeal is from the order LUBA issued on remand.

After our decision in *1000 Friends of Ore. v. Wasco Co. Court, supra,* but before LUBA's decision on remand, the Land Conservation and Development Commission (LCDC) promulgated a "Temporary Rule for Application of the State-wide Planning Goals to the Incorporation of New Cities." OAR 660-14-000 *et seq.* As summarized in LUBA's order, the rule provides that,

"* * * when authorizing an incorporation election for an area outside an acknowledged urban growth boundary, * * * a county [must] take an exception to Goal 14 'to allow urban

---

[1] As used in this opinion, the term "respondents" refers to the respondents other than Wasco County Court.

[2] ORS 197.015(10) was subsequently amended by Oregon Laws 1983, chapter 827, section 1, but the amendment is not relevant here.

uses to be established on rural lands.' * * * Where a new city is to be incorporated within an acknowledged urban growth boundary, no exception is required." (Footnote omitted.)

The area in question is not within an acknowledged urban growth boundary (UGB). LCDC promulgated the rule long after the county's decision, and the county of course had not taken an exception pursuant to the rule. However, the rule contains a retroactive effective date of August 21, 1981, which predates the county's approval of the incorporation petition and authorization of the election.

■      LUBA concluded that the county was required to apply the LCDC rule and directed that the county do so on remand. LUBA also concluded that the county's decision violated Goal 14 and Goal 3. Petitioners assign error to each of those conclusions. Their threshold contentions are that the LCDC rule was improperly adopted, that it cannot be applied retroactively to this incorporation decision made before its promulgation and, for various other reasons, that it is invalid facially or as applied here. LCDC disputes those contentions.[3] However, it also argues that the rule simply reiterates previous LCDC interpretations of Goal 14 and that LUBA's order can be sustained as a correct application of Goal 14 independently of the rule. We agree to a limited extent with LCDC's suggestion that the validity of the rule and its application can be superfluous to our decision. If the interpretation of Goal 14 in LUBA's order is erroneous and if the rule embodies the same error, it is unnecessary for us to consider now any of the other defects petitioners ascribe to the rule.[4]

---

[3] LCDC has appeared in this appeal pursuant to ORAP 5.18.

[4] Oregon Laws 1983, chapter 827, section 3, which became effective on August 9, 1983, amends ORS 197.175(1) to provide in part:

"[LCDC] shall adopt rules clarifying how the goals apply to the incorporation of a new city. * * * [T]he rules shall take effect upon adoption by [LCDC]. The applicability of rules promulgated under this section to the incorporation of cities prior to the effective date of this 1983 Act shall be determined under the laws of this state."

Section 3a of the 1983 Act states, possibly only in connection with other aspects of the amendment of ORS 197.175(1) by section 3, that the purpose of the amendment is "to correct grammatical inconsistencies" and that:

"It is not the intention of the Legislative Assembly to become involved in, or reflect on, pending proceedings concerning incorporations proclaimed before the effective date of this Act."

Goal 14 provides, as pertinent:

"GOAL: To provide for an orderly and efficient transition from rural to urban land use.

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land.

"Establishment and change of the boundaries shall be based upon consideration of the following factors:

"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities.

"The results of the above considerations shall be included in the comprehensive plan. In the case of a change of a boundary, a governing body proposing such change in the boundary separating urbanizable land from rural land, shall follow the procedures and requirements as set forth in the Land Use Planning Goal (Goal 2) for goal exceptions."

OAR 660-15-000 defines "rural," "urbanizable," and "urban," as used in Goal 14:

Rural:

"Rural lands are those which are outside the urban growth boundary and are: (a) Non-urban agricultural, forest or open space lands or, (b) Other lands suitable for sparse settlement, small farms or acreage homesites with no or hardly any public services, and which are not suitable, necessary or intended for urban use."

Urbanizable:

"Urbanizable lands are those lands within the urban growth boundary and which are identified and (a) Determined to be necessary and suitable for future urban areas (b) Can be served by urban services and facilities (c) Are needed for the expansion of an urban area."

Urban:

"Urban areas are those places which must have an incorporated city. Such areas may include lands adjacent to and outside the incorporated city and may also[:] (a) Have concentrations of persons who generally reside and work in the area (b) Have supporting public facilities and services."

LUBA's order[5] holds, in effect, that the incorporation of a city on rural land outside an established urban growth boundary is a *per se* violation of Goal 14 and is impermissible unless the body approving the incorporation petition takes a Goal 2 exception to Goal 14.[6] LCDC explains in its brief:

"LCDC's [and LUBA's] interpretation of Goal 14 and the related goal definitions, as they apply to incorporations, can be summarized in a simple four-step analysis:

"*Step 1:* The effect of an incorporation is to make land available for urbanization.

"*Step 2:* Goal 14 prohibits urbanization of land outside urban growth boundaries.

---

[5] The order incorporates LCDC's extensive modifications of LUBA's proposed disposition of issues involving the statewide planning goals. *See* Or Laws 1979, ch 772, §§ 5, 6, as amended by Or Laws 1981, ch 748, §§ 36, 36a.

[6] The exceptions provision of Goal 2, Part II, is:

"When, during the application of the statewide goals to plans, it appears that it is not possible to apply the appropriate goal to specific properties or situations, then each proposed exception to a goal shall be set forth during the plan preparation phases and also specifically noted in the notices of public hearing. The notices of hearing shall summarize the issues in an understandable and meaningful manner.

"If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the plan and shall include:

"(a)  Why these other uses should be provided for;

"(b)  What alternative locations within the area could be used for the proposed uses;

"(c)  What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;

"(d)  A finding that the proposed uses will be compatible with other adjacent uses."

"*Step 3:* Therefore, Goal 14 prohibits incorporation of a city on land outside urban growth boundaries.

"*Step 4:* Because Goal 14 prohibits such an incorporation, an exception to the goal must be taken."[7]

Petitioners argue that the only land use decision that *can* bring about urbanization of rural land is the establishment of a UGB and that the incorporation of a city cannot do so. Because a UGB must comply with Goal 14, and must ultimately be reviewed by LCDC for compliance with the goal, ORS 197.251, petitioners contend that the act of incorporation has no immediate or direct bearing on the conversion of land. Incorporation simply creates a city that must later undertake a second act—establishing a UGB—that is the meaningful one for purposes of Goal 14.

Neither LUBA's order nor the defenses respondents and LCDC make for it succeed in closing the gap petitioners identify between incorporation and changes in the classification or use of land. Respondents argue, for example:

"Incorporation of a new city on 'rural land'—land outside urban growth boundaries—is inconsistent with Goal 14. The effect of incorporation, by itself, is to enable rural land to be converted to urban uses, because where a city exists, there may be 'urban land' under the goals' definitions. Where incorporation occurs outside of urban growth boundaries it makes lands available for urban development which Goal 14 otherwise requires to be rural. * * *

"Petitioners argue that Goal 14 contains no prohibition of urban development on rural land. * * *

"In fact, Goal 14 plainly does prohibit urbanization outside urban growth boundaries. It requires the establishment of UGBs 'to identify and separate urbanizable land from rural land' in order to 'provide for an orderly and efficient transition from rural to urban land use.' * * *"

We question respondents' starting proposition—which appears to be central to LUBA's and LCDC's reasoning as well as respondents'—that "incorporation, by itself, [enables] rural land to be converted to urban uses, because where a city exists, there may be 'urban land' under the goals'

---

[7] At oral argument, respondents' counsel endorsed LCDC's formulation of the argument.

.

definitions." Respondents' apparent reference is to the definition of "urban," which states in part that "[u]rban areas are those places which must have an incorporated city." However, the more logical meaning of the definition is that intense urban uses cannot be sustained without the service capacities of an incorporated city, not that the existence of a city in itself automatically permits or creates urban uses on rural land. If the latter were the intended meaning, the definition would be inconsistent with the Goal 14 requirement that existing cities follow the UGB establishment procedure for urbanizing land. *See 1000 Friends v. LCDC,* 292 Or 735, 642 P2d 1158 (1982); *see also Branscomb v. LCDC,* 64 Or App 738, 741, 669 P2d 1192 (1983), *rev allowed* 296 Or 253 (1984) (observing that, under the goal definitions, "rural lands * * * do not exist within the meaning of the goals until a UGB is established").

In any event, whatever difficulties there may be with their starting proposition, respondents *conclude* that "[Goal 14] requires establishment of UGBs 'to identify and separate urbanizable from rural land * * *.' " They therefore appear to recognize that, as petitioners argue, the establishment of a UGB, rather than incorporation, is the event that effectively converts or preserves the character or use of rural land.[8]

LUBA in its order and LCDC in its argument here rely on our statement in *1000 Friends of Ore. v. Wasco Co. Court, supra,* that incorporation makes "land that could not before have been used for urban use * * * available for *future* urban use." 62 Or App at 82. (Emphasis supplied.) *See also Petersen v. Klamath Falls,* 279 Or 249, 253-54, 566 P2d 1193 (1977) (referring to annexation as a "local planning [activity] which will have a significant impact on present or future land uses * * *" and, therefore, as being subject to state land use regulation). It is of course a truism that the statewide planning goals apply to actions affecting future land uses as well as actions that have an immediate impact. However, that truism

---

[8] The Wasco County comprehensive plan, as well as the city's UGB, would of course be relevant to the "urban," "urbanizable" or "rural" character of the area proposed for incorporation. Although petitioners make some arguments based on the current status of the area under the county plan, we note that LCDC has not acknowledged the part of the plan that relates to the area. *See Roth v. LCDC,* 57 Or App 611, 646 P2d 85 (1982). Goal 14 requires:

"Establishment and change of the [urban growth] boundaries shall be a cooperative process between a city and the county or counties that surround it."

does not advance the inquiry. *1000 Friends* and *Petersen* hold only that incorporation and annexation are among the kinds of decisions that must be made in accordance with applicable goals and other state land use law. Neither case addresses how any particular goal applies to such decisions. More specifically, neither case addresses how Goal 14 or its statutory and regulatory predecessors apply to the *first in a continuum of actions* that begins with annexation or incorporation and culminates in a city's proposal of a UGB and LCDC acknowledgment of the proposal, which the goal and ORS 197.251 require to be completed before urbanization can occur. The abstract fact that the goals apply to decisions that affect future land use provides no instruction about how a particular goal should be applied to a particular decision when the goal itself makes the transition to a future use contingent on a later decision that must comply with the goal.

For similar reasons, we see little relationship between the Goal 14 issues here and the issues decided in previous LCDC and LUBA cases which respondents and LCDC cite for the proposition that "Goal 14 and the related goal definitions prohibit urbanization outside urban growth boundaries." *See Ashland v. Jackson County,* 2 Or LUBA 378 (1981); *Conarow v. Coos County,* 2 Or LUBA 190 (1981); *Wright v. Marion County,* 1 Or LUBA 164 (1980); *Sandy v. Clackamas County,* 3 LCDC 139 (1979). Assuming its correctness, that proposition does not support the conclusion its proponents draw from it. It does not follow from the premise that, if Goal 14 prohibits urbanization outside UGBs, an action which cannot result in urbanization or conversion before a UGB is established is also prohibited.

Neither LUBA's order nor the arguments made in its support take the UGB establishment process into account or consider the application of the Goal 14 factors to particular facts.[9] LUBA's reasoning and the *per se* violation interpretation that emerges from that reasoning are circular. That is illustrated by note 11 to LUBA's order, which states in part:

---

[9] Indeed, LUBA expressly concluded that consideration of the Goal 14 conversion factors is *unnecessary* to permit an incorporation decision, if an exception meeting the criteria of Goal 2 is taken. *See* notes 10 and 11, *infra.*

"Goal 14, by its terms, only allows urbanization where there is an existing city. The goal contemplates the establishment of urban growth boundaries as the means 'to provide an orderly and efficient transition from rural to urban land use.' Urban growth boundaries are to be drawn around cities and may be coterminous with the city limits or not, depending upon the need for urbanizable land. The goal fails to establish any other means for converting rural to urban land use. Where no city exists, therefore, the Goal 14 factors for the establishment of an urban growth boundary cannot be applied, and a Goal 2 exception is necessary. * * *"

It is not correct that the incorporation of a new city on rural land necessarily will—or, consistently with Goal 14 can—result in urbanization that does not comply with the goal. The very fact that Goal 14 makes the establishment of a UGB the exclusive means for converting rural land to present or prospective urban uses means that the city's subsequent establishment of a UGB, and not the city's creation, is the event that determines what land may be urbanized and what rural land will be preserved. LUBA's suggestion that, if a city does not exist, it cannot establish a UGB or apply the Goal 14 factors is of course true, but it is also meaningless. If no city exists, no UGB can be established for it; if a new city is incorporated, it *does* exist and it thereby becomes as subject to the Goal 14 UGB requirements as cities that were incorporated before Goal 14 was promulgated. In either event, urbanization cannot take place outside the Goal 14 framework.

In sum, there is a fundamental flaw in LUBA's interpretation that incorporation on rural land outside an existing UGB is a *per se* violation of Goal 14. It rests on the assumption that incorporation necessarily entails future urbanization, when in fact incorporation cannot have that effect independently of the UGB process and the conversion factors Goal 14 establishes to regulate urbanization. LUBA's interpretation effectively replaces the goal's standards and mechanisms for preventing inappropriate urbanization with a generalized prediction that urbanization of rural land is the inevitable consequence of incorporation. That prediction has no predicate in the goal, and it presupposes that the process the goal *does* establish to regulate urbanization is insufficient to achieve the goal's objectives. The interpretation is really a de facto amendment of the goal.

■ There is a second fundamental error in LUBA's Goal 14 rulings, which may be academic to this appeal in the light of what we have said regarding the first error, but which we nevertheless address because it may be relevant to LUBA's disposition on remand. Notwithstanding its conclusion that incorporation of the city would violate the Goal 14 conversion and urbanization requirements, LUBA held that a Goal 2 exception to Goal 14 could permit the county to approve the incorporation petition and authorize an election. The purpose of a Goal 2 exception to a statewide planning goal is to allow a particular land use that the goal would otherwise preclude, or to alter the way in which the goal would otherwise apply to the use. *See* note 6, *supra; see also Shadybrook Environ. Protect. Assn. v. Wash Co.,* 61 Or App 474, 658 P2d 1168, *rev den* 294 Or 682 (1983). However, an exception taken for the limited purpose of permitting the incorporation to proceed would not allow any urban use or urbanization that Goal 14 would otherwise preclude and would not have any effect on how Goal 14 will later apply to land use actions involving conversion or urbanization.

■ As LUBA's order states, the criteria for an exception under Goal 2 differ substantially from the Goal 14 criteria for conversion from rural to urbanizable land.[10] *See Roth v.*

---

[10] The order states:

"* * * Exceptions criteria, while similar in some respects to criteria in Goal 14 for the conversion of rural to urbanizable land, are not identical. Goal 2 exceptions criteria include a more basic inquiry into why a use (in this case a city) should be allowed and what alternative locations within the area might be used for the use. A Goal 14 inquiry is more limited to the specifics of population, housing, public facilities and services and other related matters that are pertinent to establishment of urban growth boundaries around existing cities.

"* * * * *

"Some of the questions asked during the course of the exceptions procedure will mirror questions asked while drawing the boundaries of the city and deciding, pursuant to the seven conversion factors in Goal 14, what urban growth boundaries should be established for the city. The Board believes it is important to note, however, that an urban growth boundary need not be established for a proposed city before the petition for incorporation is approved. The Board understands the [LCDC] rule simply to require an exception to be taken to Goal 14 in order to create the legal entity, a city, without which the Goal 14 factors for the establishment of an urban growth boundary can not be applied. Certainly, drawing initial city boundaries and answering, particularly, the first two of the exceptions criteria will involve consideration of some of the same issues listed in factors 1 through 7 in Goal 14. For example, land needed for housing, employment, public facilities and services and other urban uses will have to be determined and

*LCDC,* 57 Or App 611, 646 P2d 85 (1982). A Goal 2 exception that allows nothing more than a repetition of the incorporation decision that LUBA found erroneous could not make the city's existence less repugnant to the Goal 14 conversion and urbanization standards and would not make the city less subject to those standards. Somewhat ironically, the only meaningful effect of the exception would be to make compliance with the Goal 14 urbanization standards determinable at the time the UGB is established rather than at the time of incorporation. That effect would be consistent with what we have said but would not be consistent with LUBA's interpretation of the basic relationship between Goal 14 and incorporation. If, contrary to what we hold, LUBA was correct in concluding that the incorporation decision was a *per se* violation of Goal 14, its conclusion concerning the application of Goal 2 was not correct. An exception cannot simultaneously validate a land use decision that violates a goal and leave unaffected the way in which the goal applies to the use that ostensibly follows from the decision.[11]

----

converted into lines which will represent the proposed city boundaries. The Board does not believe, however, that in taking this action there must be an analysis of a scale comparable to that required when drawing an urban growth boundary. A showing by compelling reasons and facts that a city should be allowed, that it should be in the area proposed, that it will not damage the environment, the economic, social and energy qualities of the area, the region or the state and that the city will be compatible with adjacent uses is sufficient for compliance with the rule and approval of an incorporation petition.

"After incorporation, the process of drawing urban growth boundaries and making a comprehensive plan of sufficient quality to pass an acknowledgment review must be undertaken. There is no way of knowing at the pre-incorporation stage what the urban growth boundaries will be. There may be circumstances in which incorporation of a city will precede by some considerable time any inhabitants or even any construction activities. * * *" (Footnotes omitted.)

[11] We do not imply that there cannot be a Goal 2 exception that permits land to be designated as urban or urbanizable and included within a UGB when Goal 14 would otherwise preclude its inclusion. We conclude only that an exception which simply removes the prohibition on incorporation LUBA ascribes to Goal 14, but does not affect the applicability of or way that goal applies to urbanization in the new city, is inconsistent with the goal as LUBA interprets it.

It is noteworthy that Goal 14 *expressly* contemplates the use of the Goal 2 exceptions process "[i]n the case of a *change* of a [UGB]" (emphasis supplied), but does not refer to the exceptions procedure in connection with the adoption of a locality's original UGB. *See Branscomb v. LCDC, supra,* 64 Or App at 741 ("[T]he Goal 2 exception process is not applicable until after a UGB has been established by acknowledgment"). Our discussion relates to the exceptions process under Goal 2, in effect at the time of LUBA's order, and is not intended as a comment on the exceptions provisions of Oregon Laws 1983, chapter 827, sections 19a and 19b, or of any goal amendments or rules adopted pursuant to those provisions.

Respondents argue that, under *Springfield Education Assn. v. School District,* 290 Or 217, 229, 621 P2d 547 (1980), LCDC's interpretation of Goal 14[12] is reviewable by us only "to see that [LCDC's] decision is within the range of discretion allowed by the more general policy" of the statute delegating policy-making authority to LCDC. *Springfield* does not assist respondents. LUBA's interpretation misapplies the goals and cannot be sustained.[13]

Both petitioners and respondents assign error to LUBA's application of Goal 3, the agricultural land goal. We note preliminarily that the general issue of whether and how Goal 3 applies must also be reconsidered on remand. *See Branscomb v. LCDC, supra.*

Petitioners argue that, under our decisions in *Flury v. Land Use Board,* 50 Or App 263, 623 P2d 671 (1981), and *Lemmon v. Clemens,* 57 Or App 583, 646 P2d 633, *rev den* 293 Or 634 (1982),

"* * * in determining agricultural *suitability,* it is not sufficient merely to consider the particular parcels sought to be rezoned. Rather, the entire tract in one ownership has to be considered. * * * [However,] only the affected land [need] be considered in determining the *predominant soil classifications.* * * *" 57 Or App at 588-89. (Emphasis supplied.)

According to petitioners, LUBA erroneously considered soil types on the entire ranch rather than considering the soil types only on the part of the ranch proposed for incorporation. Although the order is not completely clear in that connection, it appears that LUBA did consider soil types on the entire ranch. Respondents argue, *inter alia,* that our decisions in *Flury* and *Lemmon* are incorrect and are contrary to LCDC's interpretation of Goal 3 in a decision it rendered before we

---

[12] *See* n 5, *supra.*

[13] Respondents' Goal 14 assignments of error in their appeal to LUBA from the county's decision were, first, that the court "erred by approving the incorporation petition absent a demonstration of need for urban uses"; and, second, that "the county court's order violates the locational factors in Goal 14." Petitioners contend that LUBA's order was "based upon errors not assigned" and upon LCDC's "determinations on goal issues not before it." We reject petitioners' contention. In their cross-appeal, respondents argue that LUBA and LCDC erred by failing to "sustain" those assignments. Although we do not comment on the merits of their assignments, we do agree that LUBA should decide them on remand if LUBA determines that Goal 14 has any application to incorporation that encompasses the substance of the assignments.

decided those two cases. Respondents invite us to overrule *Flury* and *Lemmon,* and we decline.

In their cross-appeal, respondents contend that LUBA erred by not resolving their assignment that "the County's finding that the land to be incorporated was unsuitable for farming * * * lacked evidentiary support." Again, it is not clear from the order whether LUBA did resolve that contention.[14] If LUBA's basic reconsideration of whether and how Goal 3 applies to the county's decision necessitates that it reach the specific Goal 3 issues the parties raise, it should consider those specific issues consistently with this opinion.

Most of the remaining assignments in the appeal and the cross-appeal require no discussion, either because they are necessarily disposed of or rendered moot by what we have said here or elsewhere, or because they are without colorable merit. *See* note 13, *supra.* As their analogs did in *1000 Friends of Ore. v. Wasco Co. Court, supra,* petitioners make a multifaceted constitutional attack on the application of the land use laws to them and on the procedures followed in this case. The constitutional arguments require little comment at this time. Petitioners state that they are members "of a protected class of citizens" and "of an unpopular minority religion." It suffices for the moment to note that no party or agency asserts in this appeal that any limitation on petitioners' ability to incorporate is attributable to their religious affiliation.

LUBA's order is reversed and remanded for reconsideration.

**JOSEPH, C. J.,** concurring.

I agree with the lead opinion's holding and its reasoning. I write separately to explain what may appear to be an anomaly in the Supreme Court's and our opinions and, also, to offer either assistance or comfort to LUBA in the task that confronts it on remand.

In *1000 Friends of Ore. v. Wasco Co. Court,* 62 Or App 75, 659 P2d 1001, *rev den* 295 Or 259 (1983) *(Wasco County I),*

---

[14] In LUBA's recitation of the facts, it refers to the "area to be incorporated" and later states that "[a]gricultural activity occurred on this land in the past, but the property had been overgrazed." For purposes of the suitability test of Goal 3, any inquiry must of course go beyond the area directly affected by the proposed action.

we held that the county's decision to authorize the incorporation election was an exercise of "planning * * * responsibilities" subject to the statewide planning goals, ORS 197.175(1), and was therefore a "land use decision" subject to LUBA's jurisdiction. ORS 197.015(10). We conclude in this appeal that, because Goal 14 regulates urbanization and conversion by requiring a specific process to be followed and a specific decision to be made *after* incorporation, the decision to incorporate cannot have an independent or direct effect on present or future land use and cannot be a *per se* violation of the urbanization and conversion provisions of the goal.

We appreciate how peculiar it is for LUBA to have jurisdiction to review a decision for goal compliance, when it is virtually, if not absolutely, impossible for the decision to violate the particular goal that is facially the most relevant. However, the peculiarity is not a consequence of our opinions. *Wasco County I* correctly construed ORS 197.175(1) and 197.015(10), at least insofar as controlling Supreme Court authority permitted; today's decision correctly interprets Goal 14. The anomaly, such as it is, inheres in the statutes and goals rather than in our interpretations. ORS 197.175(1) specifically designates incorporation as one of the city and county planning responsibilities that must accord with the goals, while Goal 14 makes the act of incorporation standing alone incapable of producing or permitting present or future urbanization; the goal makes the subsequent (and independent) UGB establishment process *the* planning device for controlling transition from rural to urban uses. Stated simply, the statutes in ORS chapter 197 make incorporation a land use decision that is reviewable, *inter alia,* for compliance with Goal 14, but the internal mechanisms of Goal 14 prevent incorporation from having any immediate or remote result that is inconsistent with the goal. *See 1000 Friends v. LCDC,* 292 Or 735, 642 P2d 1148 (1982).

As the lead opinion observes, neither *Wasco County I* nor *Petersen v. Klamath Falls,* 279 Or 249, 566 P2d 1193 (1977), addresses *how* Goal 14 is to be applied to incorporation and annexation decisions, and neither case analyzes the goal's UGB process or the bearing the existence of that process has on whether incorporation or annexation in themselves can be relevant to the goal's operation or objectives. It is not surprising that the cases do not address those matters. Although Goal

14 was in effect when the Supreme Court decided *Petersen,* the goal did not exist when the city made the annexation decision the court reviewed;[1] the *immediate* issue was whether the interim goals of *former* ORS 215.515 should have been applied by the city. ORS 215.515 contained nothing corresponding to the Goal 14 UGB process for regulating the urbanization of rural land and, so far as we can find, neither did anything else in Oregon's statutory or regulatory law before Goal 14 took effect.

Similarly, there was no question before this court in *Wasco County I* about how or whether Goal 14 applies to the decision to authorize an incorporation election; the issue was whether the decision is *reviewable* by LUBA as a "land use decision" under the ORS chapter 197 provisions, not what *specific* goals or considerations might be germane in LUBA's review. As the parties formulated it in their arguments, the reviewability question turned in part on whether the calling of the election was a "final" decision, notwithstanding the fact that the last word on incorporation is the outcome of the election, rather than its authorization. We said, in that context:

> "* * * What is final for purposes of LUBA review (and ours) is not necessarily the act that completes the process; it is, rather, LUBA's concern as the last decision that concerns a local government's application of the goals, ORS 197.015(10)(a) * * *."

> "* * * The court [in *City of Pendleton v. Kerns,* 294 Or 126, 643 P2d 658 (1982),] applied *Petersen* to hold that the ordinance was 'subject to LUBA review if, but only if, it can be said that the street improvement *work* will have a "significant impact on present or future land uses" * * *.' 294 Or at 134. (Emphasis added.) The court did not say that the decision had to have that impact before it was reviewable; it said that the implementation of the decision must have an impact. Yet, that decision was reviewable before the decision could be implemented or have an impact. We understand the standard to mean that if the completed process would have a significant impact, the decision implementing the process is reviewable.

---

[1] There is some discussion of LCDC's "urbanization goal" in *Petersen,* but that discussion is not helpful in determining whether or how the Goal 14 UGB process and conversion factors can be applied to an incorporation decision.

"Implementation of the county's decision is the election to incorporate, to set urban boundaries and to effect a transition from rural to urban land use. *See* OAR 660-15-000 (Statewide Goal 14). It will have a significant impact if, as appears reasonably possible, the voters elect to incorporate: land that could not before have been used for urban use would be available for future urban use. * * *" 62 Or App at 81-82. (Emphasis in original; footnotes omitted.)

That statement goes beyond the issue that was before us. The only "finality" question in *Wasco County I* was whether incorporation could be the consequence of the decision to call an incorporation election. ORS 197.175(1) specifies that incorporation is subject to the goals; it follows that incorporation is a "significant impact" sufficient unto itself to make the authorization of the election a reviewable land use decision under the ORS chapter 197 provisions. It was unnecessary and incorrect for us to go on to suggest in *Wasco County I* that future urbanization can in turn be a significant impact of incorporation. Unlike the land use decision in *City of Pendleton v. Kerns,* 294 Or 126, 643 P2d 658 (1982), neither the decision to call an incorporation election nor incorporation itself sets a process in motion that *can* have *any* impact on present or future land use; as today's lead opinion states, the completed process of "[i]ncorporation simply creates a city that must later [initiate a second process, establishing a UGB,] that is the meaningful one for purposes of Goal 14." (Slip opinion at 5-6.)

It may be that action by the legislature, LCDC or the Supreme Court is necessary to make the process completely coordinated and coherent. As our opinions today and in *Wasco County I* demonstrate, ORS 197.175(1) and Goal 14 can be made more compatible than they are. Similarly, it may be opportune for the Supreme Court to reassess the continuing vitality of *Petersen v. Klamath Falls, supra,* and, derivatively, of *Wasco County I,* in the light of the existence of Goal 14's UGB mechanism and in the light of the LUBA review statutes enacted after the court decided *Petersen.* In the meantime, we and LUBA must do our best with what we have to work with.