Argued and submitted November 6, 1984, Court of Appeals decision modified, proceeding remanded to LUBA July 9, reconsideration denied September 17, 1985

1000 FRIENDS OF OREGON et al,
*Respondents on Review,*

*v.*

WASCO COUNTY COURT,
*Respondent on Review,*

*and*

KNAPP et al,
*Petitioners on Review.*

(81-132; CA A29802; SC S31080)

703 P2d 207

Allen L. Johnson, of Johnson & Kloos, Eugene, and Edward J. Sullivan, Salem, argued the cause and filed the petition for petitioners on review.

Robert E. Stacey, Jr., Portland, argued the cause for respondents on review 1000 Friends et al and filed a response to the petition for review and a reply to the *amicus curiae* brief.

Wilford K. Carey, Hood River, argued the cause for respondent on review Wasco County Court.

Jeff Bennett, Assistant Attorney General, Salem, argued the cause for respondent on review Land Conservation and Development Commission** and filed a response to the petition and a reply to the amicus curiae brief. With him on the briefs were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, Mary J. Deits, Assistant Attorney General, and Michael B. Huston, Assistant Attorney General, Salem.

Ma Prem Sangeet, Rajneeshpuram, filed an *amicus curiae* brief on behalf of the City of Rajneeshpuram.

PETERSON, C. J.

** Land Conservation and Development Commission appeared pursuant to ORAP 5.18.

## PETERSON, C. J.

■ ■ Comprehensive statewide land use planning, which began in 1969 with Senate Bill 10, Or Laws 1969, ch 324, culminated with the passage of Senate Bill 100 in 1973. The impetus behind Senate Bill 100, codified in ORS chapter 197, the framework within which land use planning occurs, was legislative concern that state intervention was needed to stop a process of cumulative public harm resulting from uncoordinated land use. *See 1000 Friends v. LCDC,* 292 Or 735, 745, 642 P2d 1158, 1164 (1982). This concern is reflected in the legislative findings and policy statement, codified at ORS 197.005 and 197.010.[1] Senate Bill 100 was intended to substitute a systematic decisional process based on consideration of all relevant facts, affected interests and public policies, for the prevailing practice of inconsistent land use decisionmaking. *See 1000 Friends v. LCDC, supra,* 292 Or at 746, 642 P2d at 1164.

 This case involves a question of whether the Statewide Land Use Planning Goals,[2] and particularly the Urbanization Goal (Goal 14), apply to a county's decision to approve a petition for the incorporation of a new city

---

[1] ORS 197.005(1) sets forth the most pertinent legislative finding:

> "Uncoordinated use of lands within this state threaten[s] the orderly development, the environment of this state and the health, safety, order, convenience, prosperity and welfare of the people of this state."

ORS 197.010 makes this policy statement:

> "The Legislative Assembly declares that, in order to assure the highest possible level of liveability in Oregon, it is necessary to provide for properly prepared and coordinated comprehensive plans for cities and counties, regional areas and the state as a whole. * * *"

[2] ORS 197.225 requires the Land Conservation and Development Commission (LCDC) to "adopt goals and guidelines for use by state agencies, local governments and special districts in preparing * * * comprehensive plans." ORS 197.015(8) defines "goals" to mean the mandatory statewide planning standards adopted by LCDC pursuant to the authority granted by the legislature. The legislature did not dictate to LCDC the content of the goals which were to be adopted, but did give some substantive guidance. *1000 Friends v. LCDC,* 292 Or 735, 748, 642 P2d 1158, 1166 (1982); *see generally* ORS 197.230(1) (Or Laws 1973, ch 80, § 34). The goals are rules within the meaning of ORS 183.310(8), but different procedures are specified for goal preparation, adoption and amendment, *see* ORS 197.235 to 197.245, than are specified for promulgation of rules under the Administrative Procedures Act, ORS 183.310 to 183.500. This distinction in procedure has led the Court of Appeals to conclude that the goals occupy a preferred position over LCDC rules. *See Willamette University v. LCDC,* 45 Or App 355, 374, 608 P2d 1178, 1188 (1980). To date, 19 mandatory statewide planning goals have been adopted.

(Rajneeshpuram) and to authorize an incorporation election. More specifically, we are called upon to address the applicability of the statewide goals to the first in a continuum of actions that begins with an incorporation petition and culminates in a city's adoption of a proposed comprehensive plan and subsequent Land Conservation and Development Commission (LCDC) acknowledgment (approval) of the proposal. Resolution of the issues is strictly a matter of construing the statutes and regulations in effect in 1981, when the Wasco County Court[3] voted to approve the incorporation petition which is central to this controversy.

Three questions are presented:

1. Is incorporation of a new city a "land use decision" under ORS 197.015(10)?

We hold that it is. Therefore, the Land Use Board of Appeals (LUBA) had jurisdiction to review the county court's approval of the incorporation petition.

2. Does Goal 14, the "urbanization" goal, prohibit the incorporation of a new city on rural land absent a Goal 2, part II, exception?

We hold that it does not.

3. Do Goal 14, the "urbanization" goal, and Goal 3, the "agricultural lands" goal, apply to the incorporation decision?

We hold that they do, as specified in parts II, III and IV below.

I
THE FACTS

In July 1981, Chidvalis Rajneesh Meditation Center, one of the petitioners in this case, purchased a 64,000-acre ranch which lies east of the Cascade Range, in Wasco and Jefferson Counties. On October 14, 1981, pursuant to ORS chapter 221, a petition to incorporate 2,135 acres within the Wasco County portion of the ranch was filed by registered voters residing in the proposed area of incorporation. On November 4, 1981, the Wasco County Court held a public

---

[3] "Wasco County Court" is the governing body of Wasco County. The county court is the governing body of a county unless otherwise provided by county charter, ORS 203.111. Wasco County Court consists of a county judge and two commissioners.

hearing to consider the petition. At the hearing the county court heard testimony pertaining to whether the proposed incorporation satisfied the requirements of ORS chapter 221 and complied with the statewide planning goals. The county court made extensive findings on the matter of compliance with the statewide planning goals, fixed the boundaries of the proposed city and authorized a special incorporation election.

1000 Friends of Oregon and six named individuals (1000 Friends) appealed the county court's order to LUBA. LUBA dismissed the appeal on the ground that the order was not a "land use decision" subject to LUBA's jurisdiction under Oregon Laws 1979, chapter 772, section 4(1), as amended by Oregon Laws 1981, chapter 748, section 35 (currently ORS 197.825).

■ "Land use decision" is defined by ORS 197.015(10)[4] to include "[a] final decision * * * that concerns * * * application of * * * [t]he goals." The planning responsibilities which a city or county must undertake in accordance with the goals, as specified by the 1981 version of ORS 197.175(1), were as follows:

> "Cities and counties shall exercise their planning and zoning responsibilities, including, but not limited to, a city or special district boundary change which shall mean the incorporation or annexation of unincorporated territory by a city and the formation or change of organization of or annexation to any special district authorized by ORS 198.705 to 198.955, 199.410 to 199.519 or 451.010 to 451.600, in accordance with ORS 197.005 to 197.430 and 197.605 to 197.650 and the goals approved under ORS 197.005 to 197.430 and 197.605 to 197.650."

LUBA concluded that the terms "incorporation" and "annexation" as they appear in ORS 197.175(1) were synonyms and that the legislature did not intend to require the land use goals to be applied to the incorporation process.

LUBA's dismissal was appealed to the Court of

---

[4] Amended by Oregon Laws 1983, chapter 827, section 1. The 1983 charges are not relevant to this discussion. References to ORS chapter 197 throughout are to the 1981 codification, unless otherwise noted. The 1981 codification is applicable to this case because the effective date, August 21, 1981, predates the filing of the incorporation petition with the Wasco County Court.

Appeals. The Court of Appeals interpreted the term "incorporation" consistent with its customary legal meaning—creation of a new city—and reversed and remanded to LUBA, holding that the county court's decision to authorize the special incorporation election was a land use decision subject to LUBA review. *1000 Friends of Ore. v. Wasco Co. Court,* 62 Or App 75, 82, 659 P2d 1001, 1005 *rev den* 295 Or 259 (1983) (*Wasco County I*).

On July 14, 1983, subsequent to the Court of Appeals decision in *Wasco County I* but before LUBA's decision on remand, LCDC, using emergency temporary rule-making procedures, promulgated a "Temporary Rule for Application of the Statewide Planning Goals to the Incorporation of New Cities," OAR 660-14-000 *et seq.* The rule contained a retroactive effective date of August 21, 1981, which is before the original county order. OAR 660-14-010(1) provided in part:

> When a county authorizes an incorporation election for an area outside of an acknowledged urban growth boundary, it shall take an exception to Goal 14 to allow urban uses to be established on rural lands. If the land proposed for incorporation is also agricultural land or forest land, the County's exception to Goal 14 will also be considered an exception to Goals 3 and 4. * * *"

■ ■ An "urban growth boundary" (UGB) is a boundary line established under Goal 14 to separate urbanizable land from rural land. *City of Salem v. Families for Responsible Govt,* 298 Or 574, 577 n 3, 694 P2d 965, 966 n 3 (1985).[5] The area of the proposed incorporated city of Rajneeshpuram is not within any acknowledged UGB. In that sense, the land is rural as defined by the goal definitions.

Under Goal 14, land is classified into three categories, rural, urbanizable and urban, through the establishment of a

---

[5] The term "urban growth boundary" is not defined in the sections of ORS chapter 197 that are involved in this case. ORS 197.295 to 197.303 concern needed housing in urban growth areas. ORS 197.295(4) (presently subsection (5)) defines the term as follows:

"As used in ORS 197.013, 197.303 to 197.307:

"* * * * *

"(4) 'Urban growth boundary' means an urban growth boundary included or referenced in a comprehensive plan."

UGB. The terms are defined by the Statewide Planning Goal Definitions:

"RURAL LAND: Rural lands are those which are outside the urban growth boundary and are;

(a) Non-urban agricultural, forest or open space lands or,

(b) Other lands suitable for sparse settlement, small farms or acreage homesites with no or hardly any public services, and which are not suitable, necessary or intended for urban use."

"URBANIZABLE LAND: Urbanizable lands are those lands within the urban growth boundary and which are identified and

(a) Determined to be necessary and suitable for future urban uses

(b) Can be served by urban services and facilities

(c) Are needed for the expansion of an urban area."

"URBAN LAND: Urban areas are those places which must have an incorporated city. Such areas may include lands adjacent to and outside the incorporated city and may also:

(a) Have concentrations of persons who generally reside and work in the area

(b) Have supporting public facilities and services."

Goal 14 specifies the requirements for conversion of rural land to urban land. The goal provides:

"To provide for an orderly and efficient transition from rural to urban land use.

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land.

"Establishment and change of the boundaries shall be based upon consideration of the following factors:

"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequence;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities.

"The results of the above considerations shall be included in the comprehensive plan. In the case of a change of a boundary, a governing body proposing such change in the boundary separating urbanizable land from rural land, shall follow the procedures and requirements as set forth in the Land Use Planning goal (Goal 2) for goal exceptions.

"Any urban growth boundary established prior to January 1, 1975 which includes rural lands that have not been built upon shall be reviewed by the governing body, utilizing the same factors applicable to the establishment or change of urban growth boundaries.

"* * * * *

"Land within the boundaries separating urbanizable land from rural land shall be considered available over time for urban uses. Conversion of urbanizable land to urban uses shall be based on consideration of:

"(1) Orderly, economic provision for public facilities and services;

"(2) Availability of sufficient land for the various uses to insure choices in the market place;

"(3) LCDC goals; and,

"(4) Encouragement of development within urban areas before conversion of urbanizable areas."

The exceptions process is found in part II of Goal 2. A goal exception is necessary where an applicable goal would otherwise prohibit a local government's proposed action. An exception is essentially a variance that allows state land use goal requirements to be waived where, for some compelling reason, it is "not possible to apply the appropriate goal to specific properties or situations." Goal 2, part II.[6]

---

[6] The Goal 2, part II, exceptions provision stated:

"When, during the application of the statewide goals to plans, it appears that it is not possible to apply the appropriate goal to specific properties or situations, then each proposed exception to a goal shall be set forth during the plan preparation

Although the county court considered factors (1) through (7) of Goal 14 and made findings as to each factor, no exception was taken under Goal 2, part II. The county court order notes that "[o]ur decision to submit this petition to an election does not in itself authorize or otherwise permit the establishment of urban uses in the area."

On September 30, 1983, after remand from the Court of Appeals, LUBA issued an order remanding the grant of the petition for incorporation to Wasco County for failure to take an exception to Goal 14 and for inadequate findings on the applicability of Goal 3.[7] *1000 Friends of Oregon v. Wasco County,* LUBA No. 81-132 (Sept. 30, 1983).

Petitioners on review, Knapp et al. (petitioners), appealed LUBA's order. 1000 Friends cross-appealed. A three-judge panel of the Court of Appeals reversed LUBA's order and remanded to LUBA for further consideration. *1000 Friends of Oregon v. Wasco County Court,* 67 Or App 418, 679 P2d 320 (March 21, 1984). The court held that LUBA's interpretation of Goal 14 as prohibiting incorporation outside an acknowledged UGB absent a Goal 2, part II, exception was erroneous.[8] On rehearing *in banc,* the Court of Appeals with-

---

phases and also specifically noted in the notices of public hearing. The notices of hearing shall summarize the issues in an understandable and meaningful manner.

"If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the plan and shall include:

"(a) Why these other uses should be provided for;

"(b) What alternative locations within the areas could be used for the proposed uses;

"(c) What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;

"(d) A finding that the proposed uses will be compatible with other adjacent uses."

The 1983 legislature revised the exceptions process by statute. Or Laws 1983, ch 827, § 19a ( *codified as* ORS 197.732). The revisions affected the standards for an exception, but did not affect the basic purpose of allowing the requirements of the state land use goals to be waived under certain circumstances.

[7] Goal 3 is the Agricultural Lands Goal. The purpose of Goal 3 is to preserve and maintain agricultural lands. Agricultural land "in Eastern Oregon is land of predominantly Class I, II, III, IV, V and VI soils as identified in the Soil Capability Classification System of the United States Soil Conservation Service * * *."

[8] Both petitioners and 1000 Friends assigned as error LUBA's application of Goal

drew the panel's opinion and affirmed LUBA's remand to the county, modifying LUBA's order only to instruct that on remand the county should consider the incorporation solely under Goal 14 and the Goal 2 exceptions provision, and not under the temporary rule.[9] *1000 Friends of Oregon v. Wasco County Court,* 68 Or App 765, 686 P2d 375 (June 27, 1984) *(Wasco County II).*

## II
## INCORPORATION AS A LAND USE DECISION

Apart from land use considerations, the process of incorporation is simple. The petitioners for incorporation file a copy of the petition with the clerk of the county in which the largest part of the proposed city lies. ORS 221.031(1). The petition must include the name of the proposed city, a map showing the city's exterior boundaries, and a declaration of the rate of taxation, in dollars per thousand dollars of assessed value, estimated to be sufficient to support an adequate level of municipal services. ORS 221.031(2). Once the clerk stamps the petition and authorizes circulation, ORS 221.031(1), 20 percent of the electors in the area proposed to be incorporated (10 percent in counties with populations over 300,000) must sign and file the petition with the county court of the county in which the proposed petition was filed. ORS 221.040.

After proper notice, ORS 221.040(1), a hearing is held.[10] Any person interested may appear and present oral or written objections to the granting of the petition, the forming of the proposed city or the estimated tax rate. ORS 221.040(2). In this connection, any objector could also object to the incorporation on the ground that the incorporation of the city would not be in accordance with the land use goals as required by ORS 197.175(1). The county court's responsibilities are described in ORS 221.040(2):

---

3. Because the court's remand to LUBA required a basic reconsideration of whether and how Goal 3 applied to the county court's decision, the court left it to LUBA to reach the specific Goal 3 issues raised by the parties if LUBA determined it necessary to reach those issues.

[9] In view of the sweep of its holding concerning Goal 14, the court in *1000 Friends of Oregon v. Wasco County Court,* 68 Or App 765, 778, 686 P2d 375, 383 (1984) *(Wasco County II),* felt it no longer necessary to remand the Goal 3 issues to LUBA.

[10] The statute does not specify whether the hearing may be conducted by any designated person or body other than the county court. In this case the county court itself conducted the hearing.

"* * * The court may alter the boundaries as set forth in the petition to include all territory which may be benefited by being included within the boundaries of the proposed incorporated city, but shall not modify boundaries so as to exclude any land which would be benefited by the formation of the proposed city. No land shall be included in the proposed city which will not, in the judgment of the court, be benefited. * * *"

If the petition is approved, an election is ordered. ORS 221.040(3), 221.050; *see generally* ORS 221.005 to 221.106.

We first consider whether the county court's order was a land use decision as defined by ORS 197.015(10) and thus subject to LUBA review. Oregon Laws 1979, chapter 772, section 4(1), as amended by Oregon Laws 1981, chapter 748, section 35, confers on LUBA

"* * * exclusive jurisdiction to review any land use decision of a local government or special district governing body or a state agency * * *."[11]

"Land use decision" is defined by ORS 197.015(10) to mean:

"(a) A final decision or determination made by a local government or special district that concerns the adoption, amendment or application of:

"(A) The goals; * * *"

Under this definition, our inquiry is directed to two separate questions: (1) Was Wasco County's order a decision or determination concerning the application of the goals; and (2) was Wasco County's decision final?

*A. Does an order authorizing an incorporation election concern the application of the land use goals?*

Whether Wasco County's decision approving the incorporation petition and authorizing the special incorporation election concerned the application of the goals centers on the meaning of the 1981 version of ORS 197.175(1) (quoted *infra*), an awkwardly worded statute governing the planning responsibilities of cities and counties.

LUBA determined that "incorporation" as used in this statute is ambiguous. After resorting to what it called

---

[11] LUBA jurisdiction is now governed by ORS 197.825, Or Laws 1983, ch 827, § 30.

"extrinsic aids," LUBA concluded that the legislature intended to use "incorporation" in its common, nonlegal sense[12] as a synonym for annexation, and that "incorporation" in the legal sense of creating a new city was controlled solely by ORS chapter 221.[13]

The Court of Appeals, in *Wasco County I,* found the statute unambiguous, gave "incorporation" its customary legal meaning — the creation of a city[14] — and held that the legislature intended that incorporation decisions under ORS chapter 221 fall within the statutory category of planning responsibilities that counties must exercise in accordance with the applicable statewide planning goals. *Wasco County I,* 62 Or App at 80, 659 P2d at 1004.

The term "incorporation," as used in ORS 197.175(1), is ambiguous. It is difficult to ascertain from the statutory language "incorporation or annexation of unincorporated territory by a city" whether the legislature intended incorporation in the sense of creating a new city, but made a grammatical error in drafting the amendment, or whether the legislature intended incorporation as a synonym for annexation, a construction of the statute which would compel the conclusion that the legislature's amendment of ORS 197.175(1) was a meaningless act. The latter is the conclusion reached by LUBA.

The 1981 amendment to ORS 197.175(1) was accomplished through the vehicle of House Bill 2225, Or Laws 1981, ch 748, § 15. Despite its complexity, House Bill 2225 is accompanied by little legislative history. We have found no history persuasively indicating which meaning of incorporation the drafters of the amendment intended.

---

[12] LUBA cited Webster's New International Dictionary 1145 (3rd ed 1966), which defines "incorporation" as follows:

"* * * to unite with or introduce into something already existent [usually] so as to form an indistinguishable whole * * *."

[13] LUBA determined that while a county may have limited discretion to apply the goals in deciding whether property might benefit from incorporation, the legislature did not intend that counties be required to apply the goals. Wasco County Court had, in fact, determined which goals applied to incorporation and made findings regarding compliance with the applicable goals.

[14] Black's Law Dictionary 690 (5th ed 1979), defines "incorporation" as "[t]he act or process of forming or creating a corporation. The formation of a legal or political body * * *."

In *Petersen v. Klamath Falls,* 279 Or 249, 566 P2d 1193 (1977), this court concluded that, consistent with the general tone and tenor of the land use laws, chapter 197 is not concerned solely with the determination of present land uses:

"* * * It is at least equally, and perhaps more importantly, concerned with intermediate and long-term land use objectives. * * *" 279 Or at 253, 566 P2d at 1195.

Petitioners contend that incorporation is purely a political decision with no land use implications. There is no doubt that incorporation is a political choice, but the ramifications of that choice may profoundly affect the use of land. The decision to allow an incorporation election may not affect the present use of land until such time as a favorable election is held, and further planning takes place, but the incorporation decision itself sets in motion a planning and zoning process. In keeping with the tenor of chapter 197, that decision must consider all relevant factors, affected interests and public policies.

ORS 197.175(1) was passed in 1973. It has been amended three times since. The 1973 version was part of Senate Bill 100, Or Laws 1973, ch 80, §§ 17, 18. That version simply provided a broad directive to cities and counties to exercise planning and zoning responsibilities in accordance with the goals.

In 1977, partly in response to the Court of Appeals decision in *Petersen v. Klamath Falls,* 27 Or App 225, 555 P2d 801 (1976), *rev'd* 279 Or 249, 566 P2d 1193 (1977), that ORS 197.175(1) did not apply to annexations, the legislature adopted Senate Bill 570, Or Laws 1977, ch 664, § 12, which amended ORS 197.175(1) to specify that the goals applied to annexation decisions. As amended in 1977, ORS 197.175(1) provided:

"Cities and counties shall exercise their planning and zoning responsibilities, including * * * the annexation of unincorporated territory pursuant to ORS 222.111 to 222.750 and the formation of and annexation of territory to any district * * * in accordance with * * * state-wide planning goals * * *."

The 1981 legislature again amended the statute, adding the "incorporation" terminology which we construe in this case. Or Laws 1981, ch 748, § 15.

■ We think that the legislature likely had in mind a meaning of "incorporation" that is different from the meaning of "annexation"; otherwise the additional words, in essence, are meaningless. We are unwilling to deem a legislative act meaningless unless no other reasonable conclusion is available. It is reasonable and consistent with ORS chapter 197 to give the word incorporation its accepted and distinct legal meaning — creation of a new city.

It is also significant that the 1981 amendment created a parallel distinction between (a) "the *incorporation* or *annexation* of unincorporated territory by a city," and (b) "the *formation* * * * of or *annexation* to any special district * * *." (Emphasis added.) It seems likely that the legislature meant "incorporation" as regards a city to have a similar meaning to "formation" of a district.

■ The 1981 amendment to ORS 197.175(1) also deleted the specific references to ORS 222.111 to 222.750, which govern the process of annexation. The deletion of that reference to the annexation statutes, accompanied by addition of the term "incorporation," indicated a legislative intent to distinguish incorporation from annexation, and lends support to our conclusion that the "city * * * boundary changes" specified in ORS 197.175(1) are not restricted to annexation.[15] We answer the first query — whether incorporation concerns the application of the goals — in the affirmative. The 1981

---

[15] Amendments to an act may be resorted to for the discovery of the legislative intent in the enactment amended, *Kaiser Cement v. Tax Com.*, 250 Or 374, 378, 443 P2d 233, 235 (1968), and if the amendment "follows immediately and after controversies have arisen as to the true construction of the prior law it is entitled to great weight" in interpreting the amended statute. *Kaiser Cement*, 250 Or at 378, 443 P2d at 235, *quoting Holman Tfr. SPPLE Co. v. Portland*, 196 Or 551, 566, 249 P2d 175, 182, 250 P2d 929 (1952).

In 1983, during the next legislative session after *Wasco County I* was decided, ORS 197.175(1) was amended by House Bill 2295, Or Laws 1983, ch 827, § 3, to provide:

"Cities and counties shall exercise their planning and zoning responsibilities, including, but not limited to, a city or special district boundary change which shall mean the annexation of unincorporated territory by a city, *the incorporation of a new city* * * * in accordance with * * * the goals * * *." (Emphasis added.)

Section 3a of that act, Or Laws 1983, ch 827, states that the intent of the legislative assembly in amending ORS 197.175(1) was to "correct grammatical inconsistencies." While not binding on this court, the subsequent amendment of the statute supports our interpretation.

legislature intended that incorporation decisions under ORS chapter 221 fall within the statutory category of planning responsibilities which counties must exercise in accordance with the applicable land use planning goals.

 *B. Is a decision authorizing an incorporation election a "final" decision concerning the application of the goals?*

■ Our conclusion that a county's decision approving an incorporation petition and authorizing an incorporation election "concerns the * * * application of * * * [t]he goals" brings into focus the second part of the inquiry — whether the county court's decision approving the incorporation petition and authorizing the incorporation election is a final decision as required by ORS 197.015(10)(a). We conclude that it is.

Under the express terms of ORS 221.040(3), once a county approves the incorporation petition, the county "shall make an order fixing a date for a special election relating to the incorporation of the proposed city." At that point, the process passes out of the county's control and into the hands of the electorate. Therefore, the "final" decision by the county concerning the applicable goals, the *only* decision by the county concerning the creation of a new city which has a "significant impact on present or future land use," *see City of Pendleton v. Kerns,* 294 Or 126, 134-35, 653 P2d 992, 996 (1982), occurs when the county approves the petition and authorizes the election.

 *C. How goals are to be applied during the incorporation process*

Our conclusion that a county's incorporation order is a "land use decision" settles the limited jurisdictional issue of whether the county court's order is reviewable by LUBA. Which particular goals are applicable to incorporation or how the goals are to be applied by the county when considering an incorporation petition are issues of first impression for this court.

■ The goals are designed to be applied during a local government's preparation of a comprehensive plan, a process in which a county court's actions with regard to an incorporation petition are not normally a part. As a result, a county's consideration of the goals incident to an incorporation petition differs from a city's or county's application of the goals

during the planning process where specific uses are proposed for specific parcels of land.

In deciding whether incorporation of an area would be "in accordance with ORS 197.005 to 197.430 and 197.605 to 197.650 and the [land use] goals," as required by ORS 197.175(1), a county court would not undertake the type of inquiry that a city would make incident to the preparation of a comprehensive plan. A county discharges its planning and zoning responsibilities with regard to whether a proposed incorporation is "in accordance with the goals" if the county is satisfied that after a successful incorporation election it is reasonably likely that the newly incorporated city can and will comply with the goals once the city assumes primary responsibility for comprehensive planning in the area to be incorporated. The county's determination must be supported in the record like any other county land use decision.[16]

The county court correctly understood that the legislature intended counties to exercise some meaningful degree of foresight, at the time of passing on a petition for incorporation, about the probable land use consequences that might result from the incorporation of a new city, even though a proposed city's future comprehensive plan must ultimately comply with the goals. In authorizing the incorporation election, the county court repeatedly referred to the detailed land use planning requirements that the city must later meet in preparing its comprehensive plan.

Wasco County's incorporation order addressed 14 of the 19 statewide planning goals.[17] The requirements of the following goals were determined by the county court to be either satisfied or inapplicable because of the specific property involved: Goal 1 (Citizen Involvement); Goal 2 (Land Use Planning); Goal 3 (Agricultural Lands); Goal 4 (Forest Lands); Goal 5 (Open Spaces, Scenic and Historic Areas, and

---

[16] Subsequent to the proceedings in the present case, in 1983 the legislature further amended ORS 197.175(1) to provide expressly that LCDC "shall adopt rules clarifying how the goals apply to the incorporation of a new city." Or Laws 1983, ch 827, § 3. This amendment evidently reflects the legislature's recognition that guidance is needed in this area.

[17] Goals 15 to 19 clearly are not relevant to Wasco County Court's decision. Goal 15, the Willamette Greenway Goal, is concerned with the protection and conservation of land along the Willamette River. Goals 16 to 19 concern coastal resources.

Natural Resources); Goal 8 (Recreation Needs); Goal 9 (Econ-
omy of the State); Goal 11 (Public Facilities and Services);
Goal 12 (Transportation); Goal 13 (Energy Conservation);
and Goal 14 (Urbanization). The county court concluded that
Goal 6 (Air, Water and Land Resources Quality), Goal 7
(Areas Subject to Natural Disasters and Hazards), and Goal
10 (Housing) would be more appropriately addressed by the
new city after incorporation. The county court's conclusions
with respect to goals other than Goals 3 and 14 were not
challenged, and we do not review them.

## III
## THE APPLICABILITY OF GOAL 14

LUBA held, in effect, that incorporation of a city on
rural land outside an established UGB is *per se* a violation of
Goal 14, and is impermissible unless the county can justify a
Goal 2, part II, exception. Prior to this case, LCDC had not
considered a challenge to an incorporation proceeding based
on alleged goal violations. The applicability of Goal 14 to the
incorporation process was, therefore, an issue of first impres-
sion for LCDC, as it is for this court. LCDC responded to 1000
Friends' challenge to the incorporation of Rajneeshpuram by
adopting an interpretation of Goal 14 (which is also embodied
in the temporary rule) which LCDC and 1000 Friends argue is
a logical extension of, if not identical to, the agency's prior
interpretations in other contexts.

LCDC's interpretation of Goal 14 in the context of
incorporation is claimed to be grounded in the language of the
goal and related goal definitions. LCDC makes this simple
four-step analysis:

"*Step 1:* The effect of an incorporation is to make land
available for urbanization.

"*Step 2:* Goal 14 prohibits urbanization of land outside
urban growth boundaries.

"*Step 3:* Therefore, Goal 14 prohibits incorporation of a
city on land outside urban growth boundaries.

"*Step 4:* Because Goal 14 prohibits such an incorpora-
tion, an exception to the goal must be taken."

*See also Wasco County II*, 68 Or App at 768-69, 686 P2d at
377-78.

A panel of the Court of Appeals rejected LCDC's theory. The court particularly rejected LCDC's starting premise, that the effect of incorporation is to make land available for urbanization:

"* * * [T]here is a fundamental flaw in LUBA's interpretation that incorporation on rural land outside an existing UGB is a *per se* violation of Goal 14. It rests on the assumption that incorporation necessarily entails future urbanization, when in fact incorporation cannot have that effect independently of the UGB process and the conversion factors Goal 14 establishes to regulate urbanization. LUBA's interpretation effectively replaces the goal's standards and mechanisms for preventing inappropriate urbanization with a generalized prediction that urbanization of rural land is the inevitable consequence of incorporation. That prediction has no predicate in the goal, and it presupposes that the process the goal *does* establish to regulate urbanization is insufficient to achieve the goal's objectives. The interpretation is really a de facto amendment of the goal." 67 Or App at 427, 679 P2d at 326 (emphasis in original).

The panel concluded that Goal 14 simply does not apply to the incorporation process.

On reconsideration *in banc,* the Court of Appeals, in part persuaded that the panel's opinion failed to accord appropriate deference to LCDC's interpretation of its own goal, replaced it with *Wasco County II.* In a 6-4 decision, the majority determined that "contrary to [its] former approach * * * at least some urbanization of land is * * * the virtually inevitable consequence of incorporation even without an urban growth boundary." 68 Or App at 772, 686 P2d at 379 (footnote omitted). The court pointed out that because the Goal 14 factors are intended to determine *how much* and *which* land may be included in the UGB, but not *whether any* should be converted to urban use, the result of a literal application is illogical:

"* * * Essentially, any collection of 150 residents in a rural area would be able to create a city and convert their land to urban uses. *See* ORS 221.020. No unit of government will have the responsibility or authority to ask *whether* the site of the new city is an appropriate one for urbanization. Thus, it will often be easier to form a city than to subdivide or to site commercial development on rural land. At the same time, existing restrictions on development of rural land may be

avoided simply by forming a city first." 68 Or App at 772-73, 686 P2d at 380 (citation omitted; emphasis in original).

The court concluded that Goal 14 applies to incorporation, and that a Goal 2, part II, exception to Goal 14 is a prerequisite to incorporation of a city outside an urban growth boundary.

Both the dissent in *Wasco County II* and petitioners assert that this interpretation amounts to a *de facto* amendment of the goal. Both assert that the majority starts with the desired result, then works back. Judge Richardson, dissenting, criticized the majority's analysis:

"LCDC and the majority appear to agree that [Goal 14's] *UGB process* is irrelevant to incorporation, but they nevertheless consider the goal to be applicable. They begin with the assumption that incorporation can have urbanizing effects that the UGB process is inadequate to prevent. They then *postulate* that it necessarily follows from that assumption that Goal 14 *does* regulate incorporation independently of its UGB mechanism, and they launch into a labored analysis of why that independent regulatory effect should be ascribed to the goal. However, they do not identify where in Goal 14 that effect is to be found. What the majority and LCDC never do is look at the goal's language and recognize the simple fact that the goal contains nothing except the UGB process to govern the urbanization of rural land." 68 Or App at 780, 686 P2d at 384 (emphasis in original).

On its face, Goal 14 provides a process for the establishment and change of UGBs, and nothing more. On this point, 1000 Friends, LCDC and the *Wasco County II* majority appear to agree. We quote from the majority opinion:

"* * * The goal's seven factors for establishing a UGB are intended to determine *how much* land and *which* land may be included in a UGB. They do not, however, address the threshold question of *whether any land* should be converted to urban uses. 68 Or App at 770, 686 P2d at 378 (footnote omitted; emphasis in original).

Goal 14 concerns urban growth boundaries. The stated purpose of Goal 14 is "to provide for an orderly and efficient transition from rural to urban use." The goal provides a mandatory mechanism for accomplishing that purpose — the establishment of an urban growth boundary to identify and separate urbanizable land from rural land. The goal sets forth seven factors which must be considered before a local

governing body can establish a UGB, and the result of the consideration of these seven establishment factors must be included in the comprehensive plan.[18] *See City of Salem v. Families for Responsible Govt, supra,* 298 Or at 579, 694 P2d at 967.

"Urbanizable" land within the UGB may be converted over time to urban uses based upon consideration of an additional four conversion factors, which are also set forth in the goal. In order to change an established UGB, the governing body must consider the seven establishment factors of Goal 14 and satisfy the requirements of the Goal 2, part II, exceptions procedure as well.

We find no support in the language of Goal 14 for LCDC's claim that the goal applies to decisions made during the pre-incorporation stage. Nor can we discover any significance in the goal definitions of "urban," "urbanizable" and "rural" land. As noted by the Court of Appeals in *Willamette University v. LCDC,* 45 Or App 355, 369, 608 P2d 1178, 1186 (1980), the most that can be derived from the land use definition of these three terms is that once a city has an acknowledged UGB, land within the boundary is denominated "urban" or "urbanizable," and land without the boundary is denominated "rural."

The definition of "urban land" is central to LCDC's reasoning. Urban land is defined as

"* * * those places which must have an incorporated city. Such areas may include lands adjacent to and outside the incorporated city and may also: (a) Have concentrations of persons who generally reside and work in the area; (b) Have supporting public facilities and services." Statewide Planning Goal Definitions.

Under this definition, the existence of a city is a prerequiste for urban land. LCDC asserts that from this simple statement can be derived the underlying premise in its analysis: that the effect of incorporation *by itself* is to make available for urbanization land which would otherwise have to be rural, because where a city exists there may be urban land.

---

[18] LCDC characterizes the first two factors of Goal 14 as the "need" factors, requiring a city to show a need for the amount of land included within the UGB. The last five factors are characterized as "locational," requiring the city to consider which land should be included within the UGB to satisfy the need demonstrated under factors (1) and (2).

LCDC's theory is seductively simple because, realistically, most incorporated cities will eventually draw UGBs and thus have some land available for future urbanization.[19] The problem with LCDC's theory regarding the effect of incorporation is that the analysis fails to distinguish a county's participation in the incorporation process from the subsequent action of a new city exercising its planning responsibilities in accordance with ORS 197.175. The county court's decision authorized the voters in the affected area to determine by election whether to create a municipal corporation. That decision neither authorized nor accomplished any change in the classification of use of the land included within the proposed corporate boundaries.[20] Under Goal 14, it is the establishment of the UGB, and not the city's creation, that makes land available for urbanization.

In sum, before establishment of the UGB, the land within the new city's corporate boundaries retains its previous classifications. Until such time as the new city considers the seven establishment factors and adopts a UGB, pursuant to Goal 14, in cooperation with the affected county or counties, *see* ORS 197.190, and until LCDC acknowledges the comprehensive plan which includes the proposed UGB, ORS 197.251, the designations in the county's comprehensive plan and ordinances will continue to apply to the land within the new city's corporate boundaries. *City of Salem v. Families for Responsible Govt, supra,* 298 Or at 580, 694 P2d at 968; ORS 215.130(2).[21]

---

[19] The City of Lonerock is an example of an incorporated city which chose not to adopt a UGB. Instead, the city chose to be placed under a rural land use designation administered by the county. City of Lonerock Compliance Acknowledgment Order (Sept. 21, 1978); *see Wasco County II,* 68 Or App at 772 n 6, 686 P2d at 379 n 6.

[20] We note that the Wasco County Court was of the same mind. Its order states:

"We note that incorporation of the area as proposed would not simply permit the establishment of uses which are not already permitted under the existing planning and zoning for the area. Even upon incorporation, the Wasco County Comprehensive Plan and implementing ordinances will be applied to all uses of these lands until the City of Rajneeshpuram exercises its planning and zoning responsibilities pursuant to ORS 197.175. * * *"

[21] ORS 215.130(2)(a) provides:

"An ordinance designed to carry out a county comprehensive plan and a county comprehensive plan shall apply to:

"(a) The area within the county also within the boundaries of a city as a result of extending the boundaries of the city or creating a new city unless, or until

LCDC's proposition that city status alone somehow makes the land within city limits *ipso facto* urbanizable was examined and rejected by this court in *1000 Friends v. LCDC, supra.* That case explored the validity of an amendment to Goal 14 which added the following language:

> *"Before the establishment of an urban growth boundary, all lands within city limits shall be urban or urbanizable.* When the amount of land within a city's incorporated limits is determined to be adequate to satisfy the needs set forth in factors (1) and (2) above, the city limits may be designated as the urban growth boundary without consideration of factors (3) through (7) above." Goal 14 (emphasis added).

The goal amendment automatically deemed all land within the municipal boundaries of a city urban or urbanizable regardless of the actual nature or use of the land.

*1000 Friends v. LCDC, supra,* is particularly germane because there LCDC, by goal amendment, sought to effect the very "ill" it here asserts is the inevitable result of incorporation. The issue in *1000 Friends v. LCDC* was whether LCDC's delegated legislative authority permitted the adoption of a goal which required local governments to make all land within city limits available for urban development without regard to the nature and use of land or the policies of the goal generally. We held that the amendment to the goal was not authorized under the enabling statute, stating:

> "* * * [T]he legislature intended that agricultural land not be made available for urban development solely because it is within a city boundary.
>
> "* * * * *
>
> "* * * The consistent requirements by the legislature in its findings and policy statement, in its interim goals, in the statutory directions for priority consideration by LCDC in its adoption of goals, and in the breadth of definition of 'comprehensive plan,' is that the full range of affected public interests be considered in the process of comprehensive planning for land use decisions. *That requirement is offended by a goal which would make substantial areas of land available for*

---

the city has by ordinance or other provision provided otherwise; * * *"

Under subsection (b) of ORS 215.130(2), the governing body of the city may elect, by ordinance, to remain subject to the county's comprehensive plan and regulating ordinances. See note 19, *supra.*

*urban development for the sole reason that they are within city boundaries."* 292 Or at 749-50, 642 P2d at 1166-67 (footnote omitted; emphasis added).

We recognized in *1000 Friends v. LCDC, supra,* and iterate now, that there is no requirement that UGB must be coterminous with the city limits. A UGB may be designated larger or smaller than a city's corporate boundary, depending upon the outcome of the city's consideration of the Goal 14 UGB establishment factors. As this court explained in *1000 Friends v. LCDC, supra,* under Goal 14

"* * * city limits * * * have no presumptive effect. The designation of an urban growth boundary [is] guided by the seven 'factors' of Goal 14, and any other of the 19 statewide planning goals which are applicable because of the use or nature of the land to be included within the boundary. The city limits, while perhaps relevant, [are not] determinative. * * *" 292 Or at 740, 642 P2d at 1161.[22]

This is not to say that a county, in considering an incorporation petition, has no function with respect to Goal 14. The legislature deemed a county's decision in connection with a proposed incorporation a land use decision which must accord with "the goals," without exception. We take this general mandate to mean that to the extent a county can conduct a meaningful inquiry as to all 19 goals, it must do so. A county's responsibility at the time it considers a petition for an incorporation election is no greater with respect to Goal 14 than with respect to the other goals. It is to determine the compatibility of incorporation and its consequences with the criteria stated in the goal.

Incorporation will transfer to the city actual planning authority for some of the land presently within the county's planning authority. Some of the consequences of incorporation may foreseeably affect land that remains the

---

[22] Cases cited by LCDC do appear to support the agency's contention that Goal 14 has been consistently interpreted to prohibit urbanization outside existing UGBs. *See Ashland v. Jackson County,* 2 Or LUBA 378 (1981); *Conarow v. Coos County,* 2 Or LUBA 190 (1981); *Wright v. Marion County Board of Commissioners,* 1 Or LUBA 164 (1980); *Sandy v. Clackamas County,* 3 LCDC 139 (1979). However, even assuming the validity of the proposition that Goal 14 prohibits urbanization outside UGBs, it does not follow that an action which cannot result in urbanization before a UGB is established is also prohibited.

county's responsibility. The county cannot expect the proponents of incorporation to present a concrete or even a tentative comprehensive plan before the election, and we do not believe that the legislature intended this, although proponents may wish to offer their own ideas for a plan in making their record for approval of the proposed incorporation. The county can, however, expect that the proponents present evidence of the purposes sought to be achieved by incorporation insofar as these bear on future land use, such as the kind of municipal services that the city is expected to provide and the projections about future population and tax base that these purposes assume or necessarily imply. The realism of these purposes and projections and the probable consequences for land use are, of course, open to challenge.

Although this task that ORS 197.175 assigns the counties may not be easy, there is no doubt that the legislature assigned it. We believe that it can be given a practical interpretation. This case is not the occasion for discussing the procedures in detail, because Wasco County Court's findings with respect to most of the goals were not challenged. Moreover, as already stated, the legislature in 1983 further amended ORS 197.175 to direct LCDC to adopt rules "clarifying" the manner in which the task is to be performed, and cities, counties and other interested parties will have an opportunity to be heard in the process of formulating those rules.

■■ The seven establishment factors of Goal 14 are designed to be considered in conjunction with the actual drawing of a proposed UGB. Nonetheless, under the test stated in part II of this opinion, a county can determine whether it is reasonably likely that the newly incorporated city can and will consider and address the Goal 14 factors when the city eventually draws a proposed UGB, and whether it is reasonably likely that the city can and will ensure that future urbanization is appropriate and not incompatible with Goal 14 and the other goals.

■ We now consider whether the case must be remanded to LUBA to reconsider the Goal 14 issue in light of the test set forth above. LUBA held that a Goal 2, part II, exception to Goal 14 must be taken. As stated, that holding is incorrect.

Remand to the agency to reconsider the case in light of our holding on that issue is not required.

The county court appears to have considered Goal 14 essentially as we require that the goals be considered.[23] The order repeatedly refers to the future planning process which will require a more detailed analysis of the planning problems and criteria. The county court exhaustively considered Goal 14, even though it could not and did not create a UGB. Remand, therefore, is not required. We turn to one further question raised in the Court of Appeals.

The Court of Appeals also affirmed LUBA for a separate reason. Because LCDC, by adoption of the rule quoted above at page 350, had interpreted its own goal, the court held that LCDC's interpretation was entitled to "appropriate judicial respect." 68 Or App at 775-77, 686 P2d at 381-82.

Goal 14 expresses a complete statement of policy formulated by an agency with specialized expertise, experience and staff. To the extent that the goal is ambiguous, *see Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 599, 581 P2d 50, 55 (1978), the agency's reasonable interpretation of the goal is entitled to some deference by this court. *Branscomb v. LCDC,* 297 Or 142, 145, 681 P2d 124, 126 (1984). However, if LCDC's interpretation expresses a new policy or standard varying in substance from the existing policy and standards of Goal 14, the interpretation constitutes a *de facto* goal amendment and cannot be sustained by this court.

This is not an appropriate case in which to invoke the concept of deference. LCDC's interpretation is not intended to clarify ambiguities in Goal 14, rather, LCDC has developed a theory about the operation of Goal 14 which exists *independent* of the language or processes found in the goal itself. As the dissent in *Wasco County II* points out:

---

[23] The order includes this language:

"Finally, we find that the assumption of planning and zoning responsibilities pursuant to ORS 197.175 by petitioners will ensure more orderly and efficient development of the area. Once incorporated, the City of Rajneeshpuram will implement a planning process which permits a more detailed analysis of the area's development potential and limitations than is currently available at the county level. * * *"

"* * * None of the cases the majority cites in its discussion of judicial deference and related concepts suggest[s] that a court must or may sanction what LCDC is effectively doing here, *i.e.*, amending its goal in the guise of interpreting it." 68 Or App at 780, 686 P2d at 384.

To summarize: A county is not required to take a Goal 2, part II, exception to Goal 14 in order to approve a petition to incorporate land outside an existing UGB. Wasco County Court's findings and conclusions regarding Goal 14 were otherwise sufficient.

IV
THE APPLICABILITY OF GOAL 3

Goal 3 provides:

"To preserve and maintain agricultural lands.

"Agricultur[al] lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. * * *

"Conversion of rural agricultural land to urbanizable land shall be based upon consideration of the following factors: (1) environmental, energy, social and economic consequences; (2) demonstrated need consistent with LCDC goals; (3) unavailability of an alternative suitable location for the requested use; (4) compatibility of the proposed use with related agricultural land; and (5) the retention of Class I, II, III and IV soils in farm use. A governing body proposing to convert rural agricultural land to urbanizable land shall follow the procedures and requirements set forth in the Land Use Planning goal (Goal 2) for goal exceptions.

"AGRICULTURAL LAND— * * * in eastern Oregon is land of predominantly Class I, II, III, IV, V and VI soils as identified in the Soil Capability Classification System of the United States Soil Conservation Service, and other lands which are suitable for farm use taking into consideration soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land use patterns, technological and energy inputs required, or accepted farming practices. Lands in other classes which are necessary to permit farm practices to be undertaken

on adjacent or nearby lands, shall be included as agricultural land in any event."[24]

The findings of the county court describe the land as follows:

"The approximately 2,135 acres to be incorporated are comprised of 61% or 1,298 acres, Class VII and VIII soils and 35% or 738 acres, of Class VI soils. The area also contains approximately 4% acres of Class II though IV soils which will be preserved for agricultural production. Approximately 46% of the Class VI soils are characterized by slopes in excess of 20%.

"Expert testimony has established that the area proposed for incorporation is not suitable for farm use. The record reveals that the Class VI soils within the area, as well as the bulk of the entire ranch, have been historically over-grazed and will not support grazing uses without extensive reformation and land management activities. Due to soil fertility and slope limitations, these lands are similarly unavailable for row crop or other cultivation practices. The limited amount of Class II-IV soils included within the proposed boundary have been, and will continue to be, cultivated and otherwise preserved for agricultural use."

Wasco County Court concluded that because the land to be incorporated did not predominantly consist of agricultural land as defined by Goal 3, Goal 3 was inapplicable.

1000 Friends asserts that the county court should have examined the soils of the entire 64,000-acre ranch when determining the predominant soil classification, rather than only the 2,135 acres proposed for incorporation. LUBA concluded that the soils of the entire ranch should have been examined. LUBA cited *Lemmon v. Clemens,* 57 Or App 583, 646 P2d 633 (1982), and *Meyer v. Lord,* 37 Or App 59, 586 P2d 367 (1978), for this proposition.

The soil classification system referenced in Goal 3 was developed by the United States Soil Conservation Service. The system is designed to identify, based upon objective, scientific information, the predominant capability classification of soil in any given area. Soils classified I-IV in western

---

[24] "Farm use" as used in Goal 3 is defined by reference to ORS 215.203, and includes farm uses authorized by ORS 215.213.

Oregon, or I-VI in eastern Oregon, are presumptively "agricultural" under Goal 3. The soil classification system identifies the nature of the soil, without consideration of other environmental factors which may affect its use.

The question under Goal 3 of whether an area is suitable for farm use is entirely different. The suitability determination requires a governing body to look beyond the scientific soil classification taken alone to other factors such as "soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land use patterns, technological and energy inputs required, or accepted farming practices." Land with soil scientifically classified as a priority soil class, *e.g.,* Class I, may be unsuitable for farm use because of other factors, such as slope. Conversely, land consisting of low priority soil classes may nonetheless be determined to be suitable for farm use when other factors are considered, or because that land is necessary to permit farm practices to be undertaken on adjacent or nearby lands.

Both *Lemmon v. Clemens, supra,* and *Meyer v. Lord, supra,* the Court of Appeals cases cited by LUBA, held that in determining *suitability for farm use,* the entire tract and not merely the particular parcel must be examined. However, in *Flury v. Land Use Board,* 50 Or App 263, 623 P2d 671 (1981), a case not cited by LUBA, the Court of Appeals held that in determining *predominant soil classification,* only the particular parcel, and not the entire tract, must be examined, stating:

> "While *Meyer v. Lord,* 37 Or App at 69, does state that in determining the suitability of land for farm use the land affected by the proposed change 'should not be considered as if it were an isolated tract,' the suitability of land for farm use is a different matter from the preliminary and more mechanical question whether the land consists predominantly of soils in capability classes I-IV. Only the land to be subdivided need be examined to determine whether it falls predominantly within classes I-IV and would thus be presumed agricultural." 50 Or App at 267, 623 P2d at 673.

Before LUBA, 1000 Friends claimed that the county court misapplied Goal 3 in concluding that the land to be incorporated was not predominantly agricultural, based upon the contention that the county court should have examined the soil, for soil capability classification purposes, on the

entire ranch. In sustaining this claim of error, the LUBA order simply states:

"* * * Petitioners have alleged that the findings fail to consider the ranch as a whole in concluding that Goal 3 does not apply. Petitioners are correct in this assertion. Petitioners' Fourth Assignment of Error is sustained."

Insofar as Goal 3 soil classification is examined by a county in an incorporation context, we agree with *Flury v. Land Use Board, supra,* in this respect: In deciding whether it is reasonably likely that a newly incorporated city can and will exercise its land use planning responsibilities in a manner not inconsistent with Goal 3, the county court must look only to the land within the area proposed for incorporation when identifying the predominant soil capability classifications. We reject 1000 Friends' contention and LUBA's holding that the soil of the entire ranch must be considered when determining whether the soil is predominantly Classes I-VI.

1000 Friends did not challenge the sufficiency of the evidence to support the county court's conclusions regarding the classification of soil in the area to be incorporated. The county court's findings as to soil classification therefore meet the Goal 3 test.

In its appeal to LUBA, 1000 Friends also argued that "the county court's determination that the land is not suitable for farm use is not supported by substantial evidence in the whole record." LUBA never reached this suitability question because of its holding on the soil classification issue.

As previously discussed, the question whether land is "suitable for farm use" requires an inquiry into factors beyond the mere identification of scientific soil classifications. In the incorporation context, the primary focus of the suitability inquiry will be upon the area to be incorporated — whether the land to be incorporated is suitable for farm use — but several of the factors listed in the Goal 3 definition of agricultural land may require a county to consider conditions existing outside the proposed municipal boundary. In addition, even if land within the area to be incorporated is not classified as priority soil (Classes I-VI), Goal 3 nonetheless deems as agricultural "[l]ands in other classes which are necessary to permit farm practices to be undertaken on adjacent or nearby lands."

 We note that Goal 3 attaches no significance to ownership of property. In the context of incorporation, single ownership is neither a controlling nor necessarily relevant factor.[25] In an incorporation proceeding, the primary focus of the suitability inquiry is on the land within the proposed municipal boundary. Nearby or adjacent land, regardless of ownership, must also be examined to the extent that the land within the area to be incorporated is "necessary to permit farm practices to be undertaken or adjacent or nearby lands" outside the proposed municipal boundary.

 It is evident from the record that the county court did consider land outside the proposed municipal boundary in making the suitability determination.[26] Whether the county court's Goal 3 suitability determination meets the suitability tests set forth above is a question which LUBA has not yet addressed. We therefore remand to LUBA to address the question whether the county Court's Goal 3 suitability determination that "the area proposed for incorporation is not suitable for farm use" is supported by substantial evidence in the whole record.

## V
## DISPOSITION OF REVIVED ISSUE

In the proceeding before LUBA, LUBA did not reach 1000 Friends' sixth assignment of error, which concerned a claim of improper conduct by the presiding county judge:

> "The County Court's Order is Invalid Because Petitioners Were Denied an Impartial Tribunal. Judge Cantrell's Failure to Disclose Ex Parte Contacts and Conflicts of Interest, and His Failure to Withdraw from this Proceeding, Violated *Fasano* Safeguards and 14th Amendment Due Process Requirements."

---

[25] The incorporation of Rajneeshpuram was unusual in that a small part of a larger tract under single ownership was proposed for incorporation. While this situation could arise again, it is as likely that an area proposed for incorporation would consist of several small parcels under divers ownership. Under the latter circumstance, no similar claim to the one argued in this case, that the "entire ranch" must be examined, realistically could be advanced.

[26] The county court, in considering Goal 3, also considered the effect of incorporation on farm use in the surrounding area. In its findings concerning Goal 14, the county court found that the development of property within the proposed city limits would further reclamation of adjacent farm lands for agricultural production.

LUBA disposed of this assignment of error as follows:

> "Both petitioners and respondents agree this assignment of error would be rendered moot if the board were to remand or reverse the decision of the Wasco County Court. County Judge Cantrell is no longer a member of the county court. Therefore, the Board does not reach this assignment of error."

ORS 197.835(11) authorizes LUBA to "reverse or remand a land use decision under review due to ex parte contacts or bias resulting from ex parte contact with a member of the decision-making body if the member of the decision-making body did not comply with ORS 215.422(3)." ORS 215.422(3) specifies when a decision of a county governing body may be invalidated "due to ex parte contact or bias resulting from ex parte contact." In addition to ORS 197.835(11), 1000 Friends relies on what is now ORS 197.835(8)(a)(B), which requires the board to

> "* * * reverse or remand the land use decisions under review if the board finds:

> "(a) The local government or special district:

> "* * * * *

> "(B) Failed to follow the procedures applicable to the matter before it in a manner that prejudiced the substantial rights of the petitioner;"

LUBA did not address 1000 Friends' claim of ex parte contact and bias because it believed that reversal of Wasco County's decision rendered the bias question moot, and because the contested member then was no longer on the Wasco County Court.[27] The allegation of bias is not moot and must be considered. We, therefore, must remand to LUBA for determination of that issue. If the case ultimately must be remanded to the county because the county judge acted improperly, with prejudice of substantial rights, the incorporation petition must be considered anew, in light of the

---

[27] ORS 197.835(9), enacted in 1983, Or Laws 1983, ch 827, § 32, provides:

"Whenever the findings, order and record are sufficient to allow review, and to the extent possible consistent with the time requirements of ORS 197.830(12) [giving the board 77 days to issue a final order], the board shall decide all issues presented to it when reversing or remanding a land use decision described in subsections (2) to (8) of this section."

conditions existing at the time of the hearing on remand to the county.

To summarize, on remand LUBA must consider the following questions:

1. Whether the county court's Goal 3 suitability determination that "the area proposed for incorporation is not suitable for farm use" is supported by substantial evidence in the whole record; and

2. Whether the Wasco County judge acted improperly, with prejudice of substantial rights, rendering the Wasco County Court order invalid?

The decision of the Court of Appeals is modified, and the case remanded to LUBA for further proceedings not inconsistent with this opinion.