Argued and submitted March 8, affirmed May 12, 2021

HOUSING LAND ADVOCATES,
*Petitioner,*

*v.*

LAND CONSERVATION AND
DEVELOPMENT COMMISSION,
Metro, City of Hillsboro,
City of Wilsonville, City of Beaverton,
and City of King City,
*Respondents.*

Land Conservation and Development Commission
20UGB001910; A173406

492 P3d 765

Petitioner seeks judicial review of an order of the Land Conservation and Development Commission (LCDC) approving an expansion of Metro's Urban Growth Boundary (UGB). The gravamen of petitioner's claim is that LCDC's decision approving the expansion of Metro's UGB was "unlawful in substance" because Metro failed to demonstrate, prior to expanding the UGB, that its estimated 20-year housing needs cannot reasonably be accommodated on land already inside the UGB, as required by Goal 14, OAR 660-015-0000(14). Petitioner also contends that, as a direct result of LCDC's misinterpretation and misapplication of Goal 14's "reasonable accommodation" standard, LCDC's determination that Metro complied with Goal 14 is not supported by "substantial evidence." *Held*: LCDC did not err. LCDC's interpretation of Goal 14 was plausible and its decision was not unlawful in substance. Further, LCDC correctly understood and applied the substantial evidence standard of review.

Affirmed.

Micheal M. Reeder argued the cause and filed the briefs for petitioner.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. Also on the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General.

Roger A. Alfred argued the cause and filed the brief for respondent Metro.

Christopher D. Crean and Beery Elsner & Hammond, LLP, filed the brief for respondent City of Hillsboro.

Barbara A. Jacobson filed the brief for respondent City of Wilsonville.

Peter Livingston filed the brief for respondent City of Beaverton.

Peter O. Watts filed the brief for respondent City of King City.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

Petitioner seeks judicial review of an order of the Land Conservation and Development Commission (LCDC) approving an expansion of Metro's Urban Growth Boundary (UGB). On review, petitioner contends that LCDC's decision was "unlawful in substance" because LCDC "erroneously interpreted and applied provisions of law *** and made a decision not supported by an adequate basis in fact, adequate statement of reasons, or substantial evidence in approving Metro's proposals to expand the Portland Metro Area [UGB]." The gravamen of petitioner's claim is that LCDC's decision approving the expansion of Metro's UGB was unlawful in substance because Metro failed to demonstrate, prior to expanding the UGB, that its estimated 20-year housing needs "cannot reasonably be accommodated on land already inside the urban growth boundary," as required by Goal 14, OAR 660-015-0000(14). For the reasons that follow, we conclude that LCDC did not err, and we affirm.

## I.  APPLICABLE LEGAL FRAMEWORK

As context for our discussion of the facts and the parties' arguments, we first provide a brief framework of the legal setting, including information about Metro and Metro's Charter Section 5(4)(b), as well as the relevant statutory and regulatory framework in which LCDC approved Metro's expansion of its UGB.

### A.  *Metro & Metro Charter Section 5(4)(b)*

"Metro is a metropolitan service district established pursuant to ORS chapter 268, ORS 197.015(14), that includes land in Clackamas, Multnomah, and Washington counties." *Barkers Five, LLC v. LCDC*, 261 Or App 259, 266, 323 P3d 368 (2014). Metro is responsible for coordinating land use planning in that tri-county region. *Id.* (citing ORS 195.025 and ORS 268.385). "Among Metro's responsibilities is the adoption of a regional UGB." *Id.*; *see generally* ORS 268.380 - 268.390 (describing Metro's planning and land use authority).

Metro Charter Section 5(4)(b), titled "density increase prohibited," provides that "[n]either the Regional Framework

Plan nor any Metro ordinance adopted to implement the plan shall require an increase in the density of single-family neighborhoods within the existing urban growth boundary identified in the plan solely as Inner or Outer Neighborhoods." As Metro explains in its briefing, that provision was added to the Metro Charter through a ballot measure that was passed in 2002 by the voters in the Metro region and was put on the ballot and approved again by voters in 2014.

B.   *Relevant Statutory Framework*

ORS 197.296 includes requirements for planning for residential land needs for local governments, including metropolitan service districts, such as Metro.[1] Specifically, ORS 197.296(2) requires that

"[a]t periodic review *** or at any other legislative review of the comprehensive plan or regional framework plan that concerns the urban growth boundary and requires the application of a statewide planning goal relating to buildable lands for residential use, a local government shall demonstrate that its comprehensive plan or regional framework plan provides sufficient buildable lands within the urban growth boundary established pursuant to statewide planning goals to accommodate estimated housing needs for 20 years."

In "performing the duties" required by ORS 197.296(2)—*i.e.*, demonstrating the "comprehensive plan or regional framework plan provides sufficient buildable lands within the urban growth boundary *** to accommodate estimated housing needs for 20 years"—local governments, including Metro, are required to "[i]nventory the supply of buildable lands within the urban growth boundary and determine the housing capacity of the buildable lands." ORS 197.296(3)(a). That is, local governments must determine how much "housing capacity" they have within the UGB.[2]

---

[1] The ordinance at issue in this case was adopted by Metro in December 2018. All references in this opinion to ORS 197.296 are to ORS 197.296 (2017), *amended by* Or Laws 2019, ch 639, § 5, Or Laws 2019, ch 640, § 8a, which is the version of ORS 197.296 that was in effect at that time.

[2] In determining "housing capacity," under ORS 197.296(4)(b), "the local government must demonstrate consideration of":

Additionally, local governments, including Metro, must conduct "an analysis of housing need by type and density range, in accordance" with "statewide planning goals and rules relating to housing, to determine the number of units and amount of land needed for each needed housing type for the next 20 years." ORS 197.296(3)(b). That is, they must conduct an analysis estimating the "housing need" and the land needed for that housing over the next 20 years.[3]

ORS 197.296(6) specifies the actions a local government, including Metro, must undertake if the estimated "housing need" over the next 20 years, as determined pursuant to ORS 197.296(3)(b), exceeds the amount of "housing capacity," as determined pursuant to ORS 197.296(3)(a). In particular, ORS 197.296(6) specifies that

"[i]f the housing need determined pursuant to subsection (3)(b) of this section is greater than the housing capacity determined pursuant to subsection (3)(a) of this section, the local government shall take one or more of the following actions to accommodate the additional housing need:

"(a)   Amend its urban growth boundary to include sufficient buildable lands to accommodate housing needs for the next 20 years. As part of this process, the local government shall consider the effects of measures taken pursuant to paragraph (b) of this subsection. ***;

---

"(A) The extent that residential development is prohibited or restricted by local regulation and ordinance, state law and rule or federal statute and regulation;

"(B) A written long term contract or easement for radio, telecommunications or electrical facilities, if the written contract or easement is provided to the local government; and

"(C) The presence of a single-family dwelling or other structure on a lot or parcel."

[3] Pursuant to ORS 197.296(5)(a), the determination of "housing capacity and need" under ORS 197.296(3), must be based on data, including

"(A) The number, density and average mix of housing types of urban residential development that have actually occurred;

"(B) Trends in density and average mix of housing types of urban residential development;

"(C) Demographic and population trends;

"(D) Economic trends and cycles; and

"(E) The number, density and average mix of housing types that have occurred on the buildable lands described in subsection (4)(a) of this section."

"(b)  Amend its comprehensive plan, regional framework plan, functional plan or land use regulations to include new measures that demonstrably increase the likelihood that residential development will occur at densities sufficient to accommodate housing needs for the next 20 years without expansion of the urban growth boundary. \* \* \*; or

"(c)  Adopt a combination of the actions described in paragraphs (a) and (b) of this subsection."

Thus, pursuant to ORS 197.296(6), if the analysis a local government conducts pursuant to ORS 197.296(3) reflects a projected shortfall of housing over the next 20 years, a local government, including Metro, can either expand its UGB to meet that need under ORS 197.296(6)(a), implement measures to make more efficient use of land within the existing UGB to meet that need under ORS 197.296(6)(b), or a combination of those two options under ORS 197.296(6)(c).

C.  *Relevant Regulatory Framework*

In addition to the statutory framework discussed above, "Goal 14 (Urbanization), OAR 660-015-0000(14), provides particular standards for setting or changing a UGB." *DLCD v. City of Klamath Falls*, 290 Or App 495, 498, 416 P3d 326 (2018) (internal quotation marks omitted). The purpose of Goal 14 is

"[t]o provide for an orderly and efficient transition from rural to urban land use, to accommodate urban population and urban employment inside urban growth boundaries, to ensure efficient use of land, and to provide for livable communities."

"Goal 14 was adopted and amended by LCDC pursuant to its general authority to do so under ORS 197.225." *1000 Friends v. LCDC*, 292 Or 735, 744, 642 P2d 1158 (1982). It "expresses a complete statement of policy formulated by an agency with specialized expertise, experience and staff." *1000 Friends of Oregon v. Wasco County Court*, 299 Or 344, 369, 703 P2d 207 (1985).

Under Goal 14, the "[e]stablishment and change of urban growth boundaries shall be based on the following":

"(1)   Demonstrated need to accommodate long range urban population, consistent with a 20-year population forecast coordinated with affected local governments, ＊＊＊; and

"(2)   Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2)."

Importantly, for the purposes of our analysis, Goal 14 also requires that, "[p]rior to expanding an urban growth boundary, local governments shall demonstrate that needs cannot reasonably be accommodated on land already inside the urban growth boundary."

As we explained in *City of Klamath Falls*, 290 Or App at 504, "the text of the goal explicitly requires that, prior to expanding a UGB, local governments shall demonstrate that 'needs,' which we understand to refer to the needs described in both subsections (1) and (2), cannot be reasonably accommodated on land already inside the UGB."

Goal 14 is implemented by, among other LCDC regulations, OAR 660-024-0050(4). That regulation provides, in relevant part:

"If the inventory demonstrates that the development capacity of land inside the UGB is inadequate to accommodate the estimated 20-year needs ＊＊＊, the local government must amend the plan to satisfy the need deficiency, either by increasing the development capacity of land already inside the city or by expanding the UGB, or both, and in accordance with ORS 197.296 where applicable. Prior to expanding the UGB, a local government must demonstrate that the estimated needs cannot reasonably be accommodated on land already inside the UGB."

Additionally, local governments inside of Metro must meet minimum density standards and housing mix requirements for new construction, as set out in LCDC's Metropolitan Housing Rule. *See* OAR 660-007-0000 to 660-007-0060. One purpose of that division is to "ensure opportunity for the provision of adequate numbers of needed housing units and the efficient use of land within the Metropolitan Portland (Metro) urban growth boundary." In particular,

OAR 660-007-0030 through 660-007-0037 are "intended to establish by rule regional residential density and mix standards to measure Goal 10 Housing compliance for cities and counties within the Metro urban growth boundary, and *to ensure the efficient use of residential land within the regional UGB consistent with Goal 14 Urbanization*." OAR 660-007-0000 (emphasis added).

## II.   FACTS AND PROCEDURAL HISTORY

With that legal framework in mind, we turn to the facts and procedural history of the instant case.

A.   *Metro's ORS 197.296 Analysis and the Ordinance at Issue*

Following the dictates of ORS 197.296, Metro conducted an inventory of its buildable lands and an analysis of its housing needs for the next 20 years. Based on its analysis, Metro concluded that the existing metro-area UGB included sufficient land to satisfy the 20-year need for multi-family housing, but a deficit of land to satisfy the 20-year need for single-family housing. Specifically, Metro identified a 20-year need for 98,400 single-family dwelling units and determined that the existing UGB had capacity for 92,300 of those units, resulting in an anticipated shortfall of 6,100 single-family units. Metro further determined that the areas in expansion proposals submitted by the cities of Wilsonville, Hillsboro, Beaverton, and King City would provide land sufficient to accommodate those remaining single-family units.

Subsequently, Metro enacted Ordinance 18-1427, expanding the UGB to provide capacity for housing in the region until 2038. Findings of fact and conclusions of law attached to that ordinance as Exhibit F explained, in Metro's view, how the ordinance was consistent with state law, and specifically consistent with the "cannot reasonably be accommodated" standard in Goal 14. Exhibit F of the ordinance explained, in relevant part:

"Prior to expanding the UGB, Goal 14 requires Metro to determine that the identified housing need 'cannot reasonably be accommodated on land already inside the UGB.' *** Metro's analysis indicates that there is sufficient

capacity inside the UGB for the projected multifamily need over the next 20 years. However, the analysis also identifies a need for additional single-family homes that cannot be met on land already inside the UGB. *** Metro's buildable land inventory determines that the existing UGB has the capacity to provide 92,300 single-family units. That single-family capacity relies heavily on efficient use of land inside the UGB. Approximately 61 percent of the single-family capacity already inside the UGB comes from infill. When that capacity is compared to growth projections, and under the needs analysis ***, even assuming the low end of the capture rate range there is an insufficient supply of land inside the UGB to meet the identified single-family need. Metro's charter prohibits Metro from requiring any increased density in existing single-family neighborhoods, which significantly limits its ability to achieve any further efficiency to address single-family housing demand. Metro also notes that the methodology it employs for creating the buildable land inventory accounts for locally adopted measures that would increase local capacity.

"Further, while there is not an objective standard for what could 'reasonably be accommodated on land already inside the UGB' under Goal 14, the state Metropolitan Housing Rule provides some guidance. All cities and counties in the region have comprehensive plans that have been acknowledged by the DLCD, indicating that they are in compliance with that rule. This compliance indicates that cities and counties in the region have taken reasonable actions to accommodate housing growth on land already inside the UGB."

Ordinance 18-1427 also imposed numerous requirements on the four cities whose expansion proposals were approved. Specifically, the requirements include, among others:

- "Within one year after the date [Ordinance 18-1427] is acknowledged by LCDC, the four cities shall demonstrate compliance with Metro code section 3.07.120(g) and ORS 197.312(5) regarding accessory dwelling units"; the four "cities shall not require that accessory dwelling units be owner occupied"; and the four cities "shall not require off street parking when street parking is available";

- "Before amending their comprehensive plans to include the expansion areas, the four cities shall amend their codes to ensure that any future homeowners associations will not regulate housing types, including accessory dwelling units, or impose any standards that would have the effect of prohibiting or limiting the type or density of housing that would otherwise be allowable under city zoning";

- "Before amending their comprehensive plans to include the expansion areas, the four cities shall amend their codes to ensure that any future homeowners associations will not require owner occupancy of homes that have accessory dwelling units"; and

- "[The] [c]ities shall engage with service providers to consider adoption of variable system development charges designed to reduce the costs of building smaller homes in order to make them more affordable to purchasers and renters."

B.  *LCDC's Decision*

Under ORS 197.626(1), Metro submitted Ordinance 18-1427 to the Department of Land Conservation and Development, which issued a staff report recommending that LCDC approve Metro's submittal.

The LCDC order on review reflects that petitioner objected to approval of the submittal, contending among other points, that Metro's submittal did "not comply with ORS 197.296(6)." In petitioner's view, Metro "ignored ORS 197.296(6)(b) and merely accommodated its member jurisdictions' insatiable appetite for more land for single-family homes." Additionally, the LCDC order on review reflects that, with regard to Metro Charter Section 5(4)(b), which as noted above, prohibits Metro from requiring "an increase in the density of single-family neighborhoods within the existing urban growth boundary identified * * * solely as Inner or Outer Neighborhoods," petitioner argued that "Metro determined it must expand the boundary because it couldn't require additional efficiencies in single-family areas * * * and, consequently, didn't look for these efficiencies." In petitioner's view, "a proposed UGB expansion which categorically excludes the vast majority of existing lands planned

and zoned for single-family residential use from any density increases to meet an identified need for more single family-housing does not 'demonstrate' that those needs cannot be 'reasonably accommodated' on lands 'already inside the UGB.'"

LCDC rejected petitioner's objection related to ORS 197.296(6), reasoning:

"ORS 197.296(6) does not, by itself, mandate that a local government accommodate all or even a portion of a projected shortfall through more efficient use of land within an existing UGB. However, Goal 14 and OAR 660-024-0050(4) require that, 'prior to expanding the UGB, a local government must demonstrate that the estimated needs cannot reasonably be accommodated on land already inside the UGB,' and thus Metro must consider 'reasonably accommodating' the identified need through increasing residential capacity within the existing UGB, the alternative set forth in ORS 197.296(6)(b). Although there is some discretion in the determination of what can be reasonably accommodated, Metro anticipates accommodating approximately 97 percent of the anticipated 196,900 new dwelling units that will be needed in the region over the planning period within the existing UGB, including 100 percent of the anticipated demand for multifamily housing.

"Additionally, it is important to remember that Metro's [Housing Needs Analysis (HNA)] found that the Metro UGB contains more than a 20-year supply of multifamily units, and a deficit of single-family units. Thus, the question of compliance with ORS 197.296(6) rests on whether Metro has taken sufficient measures within the existing Metro UGB to meet the single-family housing deficit identified in the HNA, measures that show Metro has attempted to 'reasonably accommodate' the single-family housing need within the existing UGB as is required by Goal 14 and OAR 660-024-0050(4). Metro's submittal analyzes this issue, and includes a fairly 'aggressive' calculation of new single-family infill residential development within the existing UGB, assuming that, unless an existing lot contained a very high-value home, all lots at least 2.5 times the minimum lot size of existing zoning (2.2 in the City of Portland) would be divided into additional single-family residential building lots. Metro has also found that the median single-family lot size in the region has taken a

major long-term decrease from 8,300 square feet in 1980 to 4,400 square feet in 2016. Metro provides a description of its thorough methodology for making these assumptions, including peer review with the department's participation. The Commission determines that Metro's own assumptions and evidence, as well as the fact that the preponderance of new single-family residential development within the Metro area is expected to occur within the existing Metro UGB (92,300 of 98,400 units, or 93 percent of the 20-year need for such units), shows Metro compliance with the provisions of Goal 14 and ORS 197.296(6). Therefore, the Commission rejects this objection."

(Internal citation omitted.)

LCDC also rejected petitioner's objection concerning Metro Charter Section 5(4)(b), reasoning:

"At issue is the requirement, found in Goal 14 and OAR 660-024-0050(4) that, 'Prior to expanding the UGB, a local government must demonstrate that the estimated needs cannot reasonably be accommodated on land already inside the UGB.' This brings into consideration the question of whether requiring additional densities in the specified single-family residential neighborhoods is a 'reasonable accommodation' that Metro should have required, per OAR 660-024-0050(4). The Commission concludes that it is not, because Metro's identified need is for 6,100 single-family dwelling units.

"Local governments within the Metro area utilize a variety of measures to make efficient use of the land and all are required to meet minimum density standards and housing mix requirements of the Metropolitan Housing Rule. Beyond these minimum density requirements, additional measures utilized by at least some of the local governments within Metro include reduced parking requirements, allowance for accessory dwelling units (now mandatory, under ORS 197.312(5)), SDC waivers for some types of development, and reduced street sizing standards. The fact that Metro anticipates meeting 97 percent of the projected housing need over the next 20 years within the existing UGB *** (and 93 percent of the projected single-family housing need) demonstrates that Metro continues to make efficient use of land within its UGB, consistent with OAR 660-024-0050(4)."

LCDC further determined that petitioner did not "establish[] that Metro Charter Section 5(4)(b) has impacted Metro's accommodation of its identified need within the existing UGB."

### III.   ARGUMENTS ON REVIEW

Petitioner's single assignment of error on review includes numerous arguments and subarguments. In the end, and as noted above, we understand the gravamen of petitioner's claim to be that LCDC's decision approving the expansion of Metro's UGB was "unlawful in substance" because Metro failed to demonstrate, prior to expanding the UGB, that its housing needs "cannot reasonably be accommodated on land already inside the urban growth boundary," as required by Goal 14. In petitioner's view, Metro exempted "from Goal 14's required demonstration all 'existing residential neighborhoods' from any increases in allowed single-family home densities, based wholly or in part on Metro's self-imposed charter and plan restrictions purporting to prevent Metro from requiring any increases in allowed densities in any existing single-family neighborhoods inside Metro's current UGB." Petitioner argues that Goal 14's "'cannot reasonably accommodate' requirement precludes categorical exclusions such as the one made by Metro's charter."

Petitioner also contends that, as a "direct result of its misinterpretation and misapplication of Goal 14's substantive 'reasonable accommodation' standard," LCDC's determination that Metro complied with Goal 14 is not supported by "substantial evidence."[4]

LCDC argues that it "correctly determined that Metro complied with Goal 14 and OAR 660-024-0050(4)," and that it "correctly concluded that Metro's reliance on Metro Charter Section 5(4)(b) did not violate Goal 14." LCDC notes that, in its view, "Metro took specific steps to ensure that it could accommodate as much of its projected

---

[4] Petitioner also contends that LCDC's decision was "unlawful in substance" insofar as LCDC "erroneously interpreted and applied *** ORS 197.296, Goal 2, *** Goal 10, [and] OAR 660, Division 24." We reject those contentions without discussion.

20-year housing needs within the existing UGB as possible." According to LCDC, Metro "reasonably accommodated all of its projected need for multi-family housing and 93 percent of its projected need for single-family housing and that, in light of that accommodation, Metro's decision to expand the UGB in order to accommodate the remaining projected need for single-family housing complied with Goal 14 and OAR 660-024-0050(4)."

Metro, for its part, argues that petitioner's "Goal 14 arguments are inconsistent" with ORS 197.296(4) and (6). Specifically, Metro contends that, under ORS 197.296(4)(b), when conducting an "inventory of how much new housing could be built," Metro must consider "[t]he extent that residential development is prohibited or restricted by local regulation and ordinance, state law and rule or federal statute and regulation" and that "Metro does not have authority to amend city or county zoning codes to increase residential density" because "[l]ocal zoning is the exclusive province of the 24 cities and three counties within the Metro region."

In light of petitioner's arguments we must resolve whether LCDC's order was "unlawful in substance" insofar as it determined that Metro complied with Goal 14's requirement that a local government, such as Metro, prior to expanding its UGB, demonstrate that its housing needs "cannot reasonably be accommodated on land already inside the urban growth boundary." And in particular, whether Metro ran afoul of that standard when it failed to consider requiring "an increase in the density of single-family neighborhoods within the existing urban growth boundary" because doing so is prohibited by Metro's Charter.

## IV.  STANDARD OF REVIEW

LCDC's final order is subject to judicial review under ORS 197.651. Under that statute, this court may "not substitute its judgment for that of the Land Conservation and Development Commission as to an issue of fact." ORS 197.651(9)(b). Further, pursuant to ORS 197.651(10), the court must reverse or remand LCDC's order only if the court determines it to be "[u]nlawful in substance or

procedure," "[u]nconstitutional," or "[n]ot supported by sub-stantial evidence in the whole record as to facts found by the commission."

"The unlawful in substance review standard \*\*\* is for a mistaken interpretation of the applicable law." *Zimmerman v. LCDC*, 274 Or App 512, 519, 361 P3d 619 (2015) (internal quotation marks omitted). We give defer-ence, however, to LCDC's interpretation of its own rules. *See Wasco County Court*, 299 Or at 369 (stating about Goal 14 that "[t]o the extent that the goal is ambiguous, [LCDC's] reasonable interpretation of the goal is entitled to some deference").

As set forth in *Barkers Five, LLC*:

"We will defer to LCDC's 'plausible interpretation of its own rules, including an interpretation made in the course of applying the rule, if that interpretation is not inconsis-tent with the wording of the rule, its context, or any other source of law.' *DeLeon, Inc. v. DHS*, 220 Or App 542, 548, 188 P3d 354 (2008) (citing *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994)); *see also 1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 390, 752 P2d 271 (1988) (explaining that the legisla-ture's entrustment of an agency 'both with setting stan-dards and with applying them can imply that the agency's view of its standards (assuming that they are within their authorizing law and consistently applied) is to be given some appropriate respect by the courts')."

261 Or App at 302-03 (brackets omitted).

At issue here is LCDC's interpretation of Goal 14, which, as noted above, was "adopted and amended by LCDC pursuant to its general authority to do so." *1000 Friends*, 292 Or at 744. It is a "'rule' within the meaning of the Administrative Procedures Act." *1000 Friends of Oregon v. LCDC (Curry Co.)*, 301 Or 447, 452, 724 P2d 268 (1986). Accordingly, we defer to LCDC's plausible interpretation of that goal.[5]

---

[5] At the same time, the Supreme Court has stated that, "if LCDC's interpre-tation expresses a new policy or standard varying in substance from the existing policy and standards of Goal 14, the interpretation constitutes a *de facto* goal amendment and cannot be sustained by this court." *Wasco County Court*, 299 Or at 369.

In construing Goal 14, we consider its text, in context. *City of Klamath Falls*, 290 Or App at 504 ("We agree with DLCD that the text of the land need portion of the goal, read in context of the goal as a whole, makes clear that, before making a change to a UGB, there must be a demonstrated need under both subsections (1) and (2) of Goal 14.").[6]

## V.   ANALYSIS

In reviewing LCDC's order, as described above, we understand LCDC to have concluded that Metro, in meeting the "reasonably be accommodated" standard in Goal 14, did not have to consider requiring additional densities in specified single-family neighborhoods within the existing UGB. We further understand that that conclusion was based on LCDC's consideration of a number of circumstances: (1) local governments within Metro are already required to meet minimum density standards and housing mix requirements under the Metropolitan Housing Rule, which, as noted, is intended "to ensure the efficient use of residential land within the regional UGB consistent with Goal 14 Urbanization," and includes minimum density standards for new construction; (2) even absent required increases in density in such single-family neighborhoods, in evaluating the amount of "infill" (*i.e.*, increased density) that would occur, Metro utilized a "fairly 'aggressive'" calculation—*i.e.*, assuming that, "unless an existing lot contained a very high-value home, all lots at least 2.5 times the minimum lot size of existing zoning (2.2 in the City of Portland) would be divided into additional single-family residential building lots"; (3) local governments within Metro already utilize a variety of "measures to make efficient use of the land"; and (4) Metro was able to accommodate 92,300 of the 98,400 single-family dwelling units needed and 97 percent of the total anticipated new dwelling units needed within its UGB. LCDC also concluded that there is "some discretion in the determination of what can be reasonably accommodated."

We agree, and for the reasons below, we conclude LCDC's interpretation of Goal 14 is plausible—*i.e.*, it is not

---

[6] In consideration of a land use goal, we may also consider relevant adoption history. *Gunderson, LLC v. City of Portland*, 352 Or 648, 662-63, 290 P3d 803 (2012) (considering adoption history of Goal 15).

inconsistent with the wording of Goal 14, its context, or any other source of law—and defer to that interpretation.

A.   *The Wording of Goal 14*

We first turn to the wording of Goal 14. As an initial matter, we observe that Goal 14 does not require local governments to accommodate all of a projected shortfall in residential housing within an existing UGB, nor does it explicitly require any particular means to increase residential density before expanding a UGB. Instead, under Goal 14, to expand its UGB, a local government need only demonstrate that its projected housing need "cannot reasonably be accommodated" on land already inside the UGB.

Goal 14 does not define the phrase "reasonably be accommodated." The word "reasonably," however, is commonly understood to mean "in a reasonable manner." *Webster's Third New Int'l Dictionary* 1892 (unabridged ed 2002). "Reasonable," in turn, is commonly understood to mean, among other definitions, "not extreme : not excessive" or "moderate: as *** not demanding too much." *Id.* That is in accord with the "common legal meaning" of the word "reasonable"—*viz.*, "fair, proper, or moderate under the circumstances; sensible, taking a totality of the circumstances approach." *State v. Iseli*, 366 Or 151, 165, 458 P3d 653 (2020) (construing the word "reasonable" in OEC 804(3)(g)) (brackets and internal quotation marks omitted).

Those definitions suggest that a local government need not take "extreme" or "excessive" measures to increase residential density when determining whether projected housing need can "be accommodated" within an existing UGB. The definitions also suggest that, in evaluating whether projected housing need can "be accommodated" on land within an existing UGB, local governments can look to the "totality of the circumstances." Additionally, we note that we understand the terms "fair," "proper," and "sensible," to accord local governments a range to determine what can "reasonably be accommodated."

That understanding of what it means for housing needs to "reasonably be accommodated" is consistent with how LCDC interpreted Goal 14 when it evaluated

whether Metro's submittal was compliant with that goal. LCDC determined that Metro was in compliance with Goal 14's "reasonably be accommodated" requirement, notwithstanding that Metro did not consider requiring increases to the densities of specified single-family neighborhoods within the existing UGB, in light of circumstances identified above. Those circumstances include, among other factors, that local governments inside of Metro are required to meet minimum density standards and housing mix requirements as set out in LCDC's Metropolitan Housing Rule, which, as noted, was intended to "ensure the efficient use of residential land within the regional UGB consistent with Goal 14." Also among those factors was Metro's "fairly 'aggressive'" calculation of new single-family infill residential development that would occur even without such required increases to the densities of specified single-family neighborhoods.

Put another way, we understand LCDC to have considered that Metro's anticipated future capacity for single-family housing within the UGB relied heavily on what LCDC determined to be Metro's "efficient use of land inside the UGB" going forward, which Metro was able to accomplish, notwithstanding that Metro Charter Section 5(4)(b) prohibited Metro from requiring increases to the densities of specified single-family neighborhoods within the existing UGB.

In that regard, we note that, in Ordinance 18-1427, Metro imposed numerous requirements on the four cities whose expansion proposals were approved. Among those requirements was that the cities amend their codes to "ensure that any future homeowners associations will not regulate housing types, *** or impose any standards that would have the effect of prohibiting or limiting the type or density of housing that would otherwise be allowable under city zoning."

Thus, we conclude that LCDC's interpretation of Goal 14 is not inconsistent with the wording of Goal 14, and in particular, the "reasonably be accommodated" standard in Goal 14.

B.   *Goal 14's Context*

We also conclude that LCDC's interpretation of Goal 14 is not inconsistent with Goal 14's context.

As noted, ORS 197.296 includes a statutory requirement for planning for residential land needs for local governments, which includes an evaluation of "housing capacity," as determined pursuant to ORS 197.296(3)(a), and of "housing need" over the next 20 years, as determined pursuant to ORS 197.296(3)(b). Notably, ORS 197.296(6), unlike Goal 14, does not require that a local government determine that housing needs "cannot reasonably be accommodated on land already inside the urban growth boundary" before choosing to expand their UGB under ORS 197.296(6)(a). Instead, as LCDC observed, ORS 197.296(6) "does not[] by itself mandate that a local government accommodate all or even a portion of a projected shortfall through more efficient use of land within an existing UGB." Therefore, we do not understand ORS 197.296 to impose any standard more stringent than the "reasonably be accommodated" standard in Goal 14, and LCDC's interpretation of Goal 14 is not inconsistent with that statute.

Further, LCDC's interpretation of Goal 14 is also not inconsistent with OAR 660-024-0050(4)—one of LCDC's regulations implementing Goal 14. As noted above, that administrative rule, like Goal 14, requires that, prior to expanding the UGB, "a local government must demonstrate that the estimated needs cannot reasonably be accommodated on land already inside the UGB." We understand the "cannot reasonably be accommodated" standard in OAR 660-024-0050(4) to be subject to the same interpretation that it is in Goal 14 and therefore conclude that LCDC's interpretation of Goal 14 is not inconsistent with OAR 660-024-0050(4).

In light of the foregoing text and context, we conclude that LCDC's interpretation of Goal 14 is plausible.[7]

---

[7] We also observe that the approach taken by LCDC in its interpretation of Goal 14 is not inconsistent with the purpose of Goal 14. As noted, Goal 14 is intended

"[t]o provide for an orderly and efficient transition from rural to urban land use, to accommodate urban population and urban employment inside urban

## C.  *Petitioner's Arguments to the Contrary*

Petitioner argues for a contrary conclusion, highlighting the statement in Ordinance 18-1427, Exhibit F, that "Metro's charter prohibits Metro from requiring any increased density in existing single-family neighborhoods, which significantly limits its ability to achieve any further efficiency to address single family housing demand." According to petitioner, that statement reflects that Metro "chose to omit any meaningful investigation, analysis, or consideration of reasonable capability of a 'significant' source of additional capacity to absorb such a tiny remnant of the identified need." In petitioner's view, "[t]o allow Metro's charter and plan restrictions to exempt existing single family neighborhoods from consideration for density increases under the Urbanization Goal's 'reasonably accommodate' standard is to entrench self-imposed density restrictions in all Metro single-family zones, without regard to the policies of the goals generally, and of the Housing and Urbanization Goals in particular." (Internal quotation marks omitted.)

We disagree with petitioner regarding the import of that statement made by Metro in Ordinance 18-1427, Exhibit F. Although Metro did not consider requiring increases to density in existing single-family neighborhoods given the prohibition in Metro Charter Section 5(4)(b), and Metro noted that that prohibition in its charter "significantly" limited its ability to achieve even "further efficiency," LCDC determined that Metro "make[s] efficient use of land" as evinced by its ability to accommodate "97 percent of the projected housing need over the next 20 years within the existing UGB." In such circumstances, we cannot say that LCDC's interpretation of Goal 14 is implausible merely because it does not require Metro to impose "additional densities in the specified single-family residential neighborhoods" in order to realize efficiencies beyond those

growth boundaries, to ensure efficient use of land, and to provide for livable communities."

Here, as determined by LCDC, Metro "make[s] efficient use of land" inside of its UGB, and was able to accommodate "97 percent of the projected housing need over the next 20 years within the existing UGB," notwithstanding that Metro's Charter prohibits Metro from requiring an increase in the density of specified single-family neighborhoods within the existing urban growth boundary.

already achieved by Metro. Goal 14 does not require local governments to accommodate all of a projected shortfall in residential housing within an existing UGB.[8]

D.  *Petitioner's "Substantial Evidence" Argument*

Having concluded that LCDC's interpretation of Goal 14 is "plausible," we also reject petitioner's "substantial evidence" argument. As noted, petitioner argues that, as a "direct result of its misinterpretation and misapplication of Goal 14's substantive 'reasonable accommodation' standard," LCDC's determination that Metro complied with Goal 14 is not supported by "substantial evidence." We conclude that LCDC correctly understood and applied the substantial evidence standard of review.[9]

## VI.  CONCLUSION

In sum, we conclude that LCDC's interpretation of Goal 14 is plausible and that LCDC correctly understood and applied the substantial evidence standard of review.

---

[8] Petitioner also maintains that "[d]ensity, as a tool for protecting resource lands, a barrier to affordable housing, and a source of additional UGB capacity, is a recurring motif in Oregon's needed housing and urbanization statutes, goals, and rules," and notes that ORS 197.296 "outlines the methodology for determining both need and capacity." In petitioner's view, ORS 197.296 "makes density a key element at every stage, using the term 'density' 19 times."

We do not disagree that density is an important factor that Metro and LCDC were required to consider. Here, however, Metro's projected housing capacity anticipated increased densities and, as noted, the Metropolitan Housing Rule establishes minimum density requirements for new construction. Thus, "density" as a "tool for protecting resource land" was considered.

[9] Petitioner also argues that Metro's Charter Section 5(4)(b) is preempted by state law, insofar as it enables "Metro and its member jurisdictions to evade the requirements of land use statutes, goals, and rules."

Petitioner notes that in *City of Portland v. Dollarhide*, 300 Or 490, 501, 714 P2d 220 (1986), the Supreme Court stated that

"[t]he essential test for displacement of local ordinances (civil or criminal) by state law is whether the local rule is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive."

(Internal quotation marks omitted.)

We understand petitioner to argue that Metro Charter Section 5(4)(b) is incompatible with the state's land use statutes, goals, and rules. In light of our analysis in this opinion, we are not persuaded that Metro Charter Section 5(4)(b) cannot operate concurrently with the requirements of state land use statutes, goals, or rules. Accordingly, we reject petitioner's preemption contention.

Accordingly, we conclude that LCDC did not err, and we affirm the LCDC order on review.

Affirmed.